THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* HENRY KOVÁCIK, Defendant.

Court of Special Sessions held by a City Magistrate of the City of New York, Borough of Manhattan, March 4, 1954.

*Frank S. Hogan, District Attorney (F. Bolton Elwell, Jr.,* of counsel), for plaintiff.

*Louis L. Roos* and *Francis X. McDermott,* Police Department Legal Bureau, *amici curiæ.*

*Harvey Cohen* and *Harvey D. Silton* for defendant.

HORN, M. The defendant is charged with a violation of subdivision 5 of section 70 of the Vehicle and Traffic Law of the State of New York, in that on November 17, 1953, at about 5:05 A.M., he did operate a motor vehicle along the Henry Hudson Parkway at 96th Street, a public highway in the County, City and State of New York, while he was in an intoxicated condition.

Subdivision 5 of section 70 of the Vehicle and Traffic Law of the State of New York provides: " 5. Operating motor vehicle or motor cycle while in an intoxicated condition. Whoever

operates a motor vehicle or motor cycle while in an intoxicated condition shall be guilty of a misdemeanor. Whoever operates a motor vehicle or motor cycle while in an intoxicated condition after having been convicted of operating a motor vehicle or motor cycle while in an intoxicated condition shall be guilty of a felony and shall be punishable by imprisonment for not less than sixty days nor more than two years or by a fine of not less than two hundred dollars nor more than two thousand dollars, or by both such imprisonment and fine. Upon the trial of any action or proceeding arising out of acts alleged to have been committed by any person arrested for operating a motor vehicle or motor cycle while in an intoxicated condition, the court may admit evidence of the amount of alcohol in the defendant's blood taken within two hours of the time of the arrest, as shown by a medical or chemical analysis of his breath, blood, urine, or saliva. For the purposes of this section (a) evidence that there was, at the time, five-hundredths of one per centum, or less, by weight of alcohol in his blood, is prima facie evidence that the defendant was not in an intoxicated condition; (b) evidence that there was, at the time, more than five-hundredths of one per centum and less than fifteen-hundredths of one per centum by weight of alcohol in his blood is relevant evidence, but it is not to be given prima facie effect in indicating whether or not the defendant was in an intoxicated condition; (c) evidence that there was, at the time, fifteen-hundredths of one per centum, or more, by weight of alcohol in his blood, may be admitted as prima facie evidence that the defendant was in an intoxicated condition.''

To enable peace officers to enforce this section effectively the Legislature in 1953 enacted section 71-a of the Vehicle and Traffic Law which provides as follows: `` § 71-a. *Chemical Tests.* 1. Any person who operates a motor vehicle or motor cycle in this state shall be deemed to have given his consent to a chemical test of his breath, blood, urine, or saliva for the purpose of determining the alcoholic content of his blood provided that such test is administered at the direction of a police officer having reasonable grounds to suspect such person of driving in an intoxicated condition. If such person refuses to submit to such chemical test the test shall not be given but the commissioner shall revoke his license or permit to drive and any nonresident operating privilege. 2. Upon the request of the person who was tested, the results of such test shall be made available to him. 3. Only a duly licensed physician acting at the request of a police officer can withdraw blood for the purpose of determining

the alcoholic content therein. This limitàtion shall not apply to the taking of a urine, saliva or breath specimen. 4. The person tested shall be permitted to have a physician of his own choosing administer a chemical test in addition to the one administered at the direction of the police officer.''

The defendant elected to have his trial before a City Magistrate holding a Court of Special Sessions.

On the trial, patrolmen Wesley Bray, driver, and Edward Corbett, recorder, testified that on November 17, 1953, at about 5:05 A.M., while on traffic assignment patrolling the Henry Hudson Parkway, and following a speeding car, they observed a Pontiac automobile ahead and proceeding south in the act of pulling up to the right-hand curb of the highway and stopping, at about West 96th Street. The officers continued on, apprehended the speeding car at about 79th Street, issued a summons to the driver, and about ten minutes later returned to the Pontiac car which was in about the same location where it had stopped, to inquire whether the driver had a flat tire or was in need of assistance.

The defendant was found asleep behind the wheel, with the motor turned off, but the headlamps were still lighted. After shaking him hard, he was finally awakened. When asked whether he had had any trouble, he said '' No,'' but when asked why he was parked, he couldn't give any logical answer. Asked where he was going, he said, '' Ardsley.'' It was observed that his speech was slurred, his eyes were bloodshot, and he smelled of alcohol. After being told to get out of his car he was directed to walk. It was observed that he was weaving, stumbling and staggering from side to side. No one else was in the car, and the defendant admitted he was the driver. At that point officer Bray felt that the defendant was not in condition to drive a car so he was placed under arrest, taken to the 26th Precinct on West 135th Street, Manhattan, where after a sobriety test he was booked for driving while intoxicated.

The sobriety test was given about thirty minutes after his apprehension and was conducted by officer Bray in the presence of a police lieutenant. Asked where he was going, he replied, '' Ardsley, upstate.'' Asked, '' Where are you now? '' he replied, '' Around the George Washington Bridge.'' Asked whether he had been drinking, he replied, '' I drink.'' Asked, '' What did you drink? '' he replied, '' Mostly beer.'' Asked, '' What quantities? '' he replied, '' I had about eight beers and one shot.'' He said he started drinking at about 7:00 P.M. that evening and stopped at about 2:33 A.M. He said that he had a

pastrami sandwich and some coffee at about 1:00 A.M. He said that he had no sleep that night, and about four hours the night previous. He also stated that he had had nothing to drink after the officers first saw him.

The observations of the defendant during the test show:

1. Odor of breath — moderately alcoholic.
2. Color of face — normal.
3. Eyes — bloodshot.
4. Pupils — normal.
5. Clothes — orderly.
6. Attitude — polite and cooperative.
7. No action such as profuse hiccoughing, belching — no actions at all.
8. Balance — fair.
9. Walking and turning — fair.
10. Finger to nose test (both arms) — sure.
11. Picking up coins — sure.
12. Speech — slurred.

Officer Bray who conducted the sobriety test testified that in his opinion the defendant was under the influence of intoxicating beverages and was unable to drive safely.

After the sobriety tests at the 26th Precinct he was taken to the 18th Precinct on West 54th Street, Manhattan, for the purpose of testing on the Harger drunkometer. There at about 6:15 A.M. he was taken before detective James Osterburg, a chemist of the New York City police department's laboratory, who conducted the drunkometer test. For over eleven years this detective has been responsible for various scientific examinations of evidence, chemical, physical and microscopic. Since March, 1953, he was assigned to undertake a study of the problem of testing drinking drivers, and has been in charge of training men in the unit, now known as the intoxicated drivers testing unit of the New York City police department. In connection with this part of his duties in the laboratory, he is in charge of the control of the chemicals that are used in these tests, their preparation and use. He holds a B.A. degree, with a major in chemistry, from Brooklyn College, 1938. He has completed the course requirements for a master's degree in chemistry at the same college. In 1947, he attended a course of instruction under the auspices of the Indiana State Police, given by Professor R. N. Harger, who conceived and designed the drunkometer, and who is a member of the faculty of the medical school of Indiana University. He also took similar courses,

under the auspices of Northwestern University Traffic Institute, at New York University, given by Dr. Kurt Dubowski and Lieutenant Borkenstein of the Indiana State Police. Defendant's counsel conceded him to be qualified.

Before giving the test the defendant was asked by him whether he would take a chemical test to determine whether he was under the influence of liquor, to which he said "Yes." However, detective Osterburg believed he told the defendant that if he did not take the test his license would be suspended. On cross-examination he testified that he did not tell the defendant that he had a right to have his own doctor present or to make this examination.

Detective Osterburg prepared the drunkometer according to procedure taught by Dr. Harger, and at 6:25 A.M. the defendant inflated a balloon with his breath, which in turn was attached to the drunkometer, and the test was run. When the " endpoint " was reached the test was stopped. The ascarite tube was reweighed, the displacement in the gasometer was read and detective Osterburg, in accordance with the formula of Dr. Harger, calculated therefrom the percentage of alcohol present in the defendant's blood. The result showed that there was 0.19% of alcohol in his blood at the time of the test.

In answer to a hypothetical question Dr. Harger testified that the same test run at about 4:55 A.M. would have showed about .21 to .22% of blood alcohol. He also testified that in his opinion the defendant was intoxicated, that he was a very unsafe driver and that his ability was considerably impaired.

For his defense the defendant took the stand and testified that he had worked at his manufacturing plant at 372 Broome Street, Manhattan, from 8:00 A.M. on November 16, 1953, and continued right through to 2:30 A.M. on November 17, 1953, due to the fact that his night foreman did not report for work that evening. At 4:30 P.M. on November 16, 1953, he had a sandwich and a beer; at 9:00 to 9:30 P.M. he had two beers and a sandwich; at about 1:00 A.M. on November 17, 1953, he had one sandwich and about one and a half glasses of beer. At about 3:00 A.M. he left his place of business, got his car at Elizabeth and Kenmare Streets, Manhattan, and drove some of his workers uptown. Since they were tired, they went to have " a little night drink." The defendant said he had " a good size drink," a " double shot " of whiskey and a beer " on top of that." Altogether he had between three to four beers before the place closed.

After leaving the workers he drove west on 125th Street to the Henry Hudson Parkway, intending to go north, and to return to his home in Ardsley. Being unfamiliar with the intersection he missed the turn and started driving downtown. After about two minutes he noticed he was going in the wrong direction, but he kept on until he started to get awfully tired, " did not feel comfortable to be driving." So he decided to stop at the moment " I started to feel bad and I just don't want to drive any more." He pulled to the curb, stopped, " turned off the keys and went to sleep."

He believed that he had been sleeping there for about fifteen minutes when officer Bray awakened him. He did not remember whether the officers had him walk on the highway.

He further testified that detective Osterburg asked him to take the drunkometer test, to which he agreed because he was told that if he did not take it he would lose his license. Since he needed his car badly he decided to take it. He stated he blew into a balloon three times before enough air was had to conduct the test and thereafter sat by and watched while the air was being run through the drunkometer.

No other witnesses were called by the defendant.

At the close of the entire case and upon motion of defendant's counsel for an acquittal, the court found in favor of the People on the facts, and reserved decision solely on the questions of law involved.

The defendant's motion for an acquittal was based upon the following:

Point 1. Testing for degrees of intoxication by use of the drunkometer device is inaccurate, unreliable, and so subject to error as to be unreasonable and an arbitrary exercise of authority in violation of the Constitutions of the United States and the State of New York.

Point 2. Section 71-a of the Vehicle and Traffic Law heretofore having been held unconstitutional, defendant's submission to a chemical test and waiver of his constitutional privilege against self incrimination having been obtained under duress, under an unconstitutional enactment, must be deemed inoperative and evidence adduced thereby inadmissible.

Point 3. Subdivision 2 of section 71-a of the Vehicle and Traffic Law providing that the results of the test shall be made available to a person tested renders the section unconstitutional by reason of its failure to provide further that full and complete readings, figures and computations must be preserved and made available.

Point 4. Subdivision 4 of section 71-a providing for the presence of a personal physician to administer a chemical test in addition to the one administered by the police officer is rendered unconstitutional by reason of its failure to provide further that the person to be tested should be so notified of his right afforded him by law.

The drinking driver has for some time presented a problem to law enforcement agencies interested in safety on our highways. No one can say exactly how many motor vehicle accidents are due to a particular circumstance because most accidents have a combination of several circumstances and because few accidents are investigated carefully enough to determine exactly what the underlying causes were. However, the National Safety Council reports in Accident Facts (1953 ed.), that " among the drivers involved in fatal accidents for whom conditions were stated, 18 out of 100 had been drinking." Drivers " under the influence," i.e., the drunk driver, the most serious violation included in the category " had been drinking," averaged 7 out of 100 drivers in fatal accidents. Thus deaths in the United States numbering 2,660 are directly caused by the drunk driver. Deaths numbering 6,840 are approximately 20% of the total automobile fatalities of 38,000 attributable to drivers who had been drinking. The annual number of deaths from automobiles where alcohol played a role — year after year — greatly exceeded the 4,503 battle deaths suffered by the Marines in taking Iwo Jima nine years ago.

For many years City Magistrates of the City of New York and judges elsewhere in the trial of cases dealing with the charge of driving while in an intoxicated condition have had to make a determination based, in most cases, solely upon the observations and opinions of lay witnesses and more particularly police officers. As a result the percentage of acquittals was considerably high.

Following the enactment of section 71-a of the Vehicle and Traffic Law the police department of the City of New York assigned detective James Osterburg to make a comprehensive survey of available scientific testing devices to determine the amount of alcohol in a driver's blood for evidentiary purposes upon the trial of such cases, and conducted hundreds of experiments with such devices. As a result the department selected the " Harger Drunkometer " designed by R. N. Harger, Ph.D., chairman of the department of biochemistry and toxicology, Medical School of Indiana University, as the device to be used by the police department.

This is the first case in the city of New York where the drunkometer was used. However, thirty-two arrests for this violation were subsequently made in New York County and all were adjourned for a fixed date for joint trials and/or hearings. Since the same expert testimony as to the use of the drunkometer as a proper scientific device would be involved, counsel for the defendants Perez, Kiriluk and Green who requested a hearing only, and counsel for the defendant, stipulated with the assistant district attorney Elwell that the testimony of Dr. R. N. Harger as the People's witness would be applicable to the respective trial and hearings and would be considered as part of the record of each separate trial and/or hearings where and whenever completed in this court. Dr. Harger was extensively cross-examined by counsel for all defendants. Counsel for twelve defendants waived a hearing and were held for the Court of Special Sessions, two defendants pleaded guilty, eighteen were adjourned and one failed to appear.

Dr. R. N. Harger by occupation is a biochemist and toxicologist, holding an A.B. degree in chemistry from Washburn College in Topeka, Kansas, and a master's degree from Kansas State University at Lawrence, Kansas, and a Ph.D. degree from Yale University. He has been a professor on the faculty of the medical school of Indiana University since 1922, and chairman of the department of biochemistry and toxicology since 1934. For a number of years he has been consultant in poisons for the Indiana State Board of Health, and has either supervised or done analyses for poisons and alcohol for concerns of Indiana and some neighboring States, for some years. He has given talks and lectures before physicians and other groups, and has written thirty or forty articles in recognized scientific journals, i.e., Journal of the American Medical Association, Journal of Biological Chemistry, the Journal of Industrial Medicine, and the Journal of Criminal Law and Criminology, on the subject of poisons and alcohol and chemical tests for intoxication. For the past twenty to twenty-five years he has made a special study of the problems relating to the actual diagnosis of alcoholic intoxication. Under his direction the principal research of his department at the university has been a study of the behavior and the effects of alcohol consumed by humans and animals, including chemical tests for intoxication. He has been a member of the National Safety Council's committee on the subject since 1937.

To best understand the scientific function of the drunkometer, some knowledge of the fundamentals concerning alcohol and

its effect on the human body is necessary. There is no such thing as normal alcohol in body substances. When an alcoholic beverage is swallowed the alcohol is not digested either in the stomach or in the intestines. In contradistinction with ordinary foods, all of which have to be adjusted, no change takes place such as with starch, fats, sugar or proteins. It remains alcohol. The alcohol has a small molecule and it begins to be absorbed at once, directly into the blood stream, mainly in the small intestine and partly through the walls of the stomach, through the blood vessels which honeycomb the interior of the stomach and intestines. Tests run showed that five minutes after a single glass of beer, alcohol was found in the blood stream which was not there before. It is more than half absorbed within fifteen minutes, 80% or so in one half hour, and all within two hours. Being absorbed it immediately goes into the transportation system of the body, the bloodstream, and is carried all over the body and is deposited in the brain, liver, kidneys, muscles in every part of the body that contains water. Immediately, the level of alcohol, after the absorption in the brain, liver, etc., is about the same as that in the blood at all times. At the conclusion of the absorption process the alcohol is simply distributed throughout the whole body in proportion to the water content.

Immediately after the first alcohol is absorbed, the liver starts to burn the alcohol and most of the absorbed alcohol is disposed of finally by burning in the liver. If an individual consumes alcohol only as fast as the liver can burn it, there would be no particular piling up of alcohol in the system, and he would never become intoxicated; if not then the alcohol accumulates in all the tissues and fluids of the body, and when a sufficient amount is accumulated in the brain, intoxication begins and increases as the percentage of alcohol in the brain increases.

The liver in the average 150 pound person can burn close to one third of a fluid ounce of alcohol per hour, or on the basis of 100 proof whiskey, that would be two thirds of a fluid ounce per hour. Some people can burn alcohol at twice that rate and others at a slower rate. For a 300 pound person you would double the figures. Small portions of the alcohol are lost in the urine and in the breath, very little in the sweat. On the average, 95% is finally burned in the liver. As it is burned in the liver it is transported back from the tissues and other reservoirs to the liver and finally there is no alcohol remaining in the body.

As a result of many tests by Dr. Harger and others it has been determined that the alcohol level in the blood parallels very closely that of the brain. It is always within 5 to 10% of that of the blood. These findings by Dr. Harger have been adopted by the National Safety Council.

Since all the blood flows through the lungs where the breath comes into intimate contact with millions of blood capillaries in the lungs, the breath comes into intimate contact with the blood of the tissues of the lungs. If there is any alcohol in the blood, some of it will enter the breath in the lungs. The amount is governed by well-known laws in chemistry and physics, in particular, Henry's Law. As an illustration of the principle, place a water solution of alcohol in a jug partly filled and after a stopper is inserted shake it up with air. A certain amount will leave the water and go into vapor form in the air and then quit. If mixed for days no change will occur. Now, Henry's Law says that at a given temperature the ratio of the concentration in the water phase to that of the air phase is constant. If you know one you can calculate the other exactly for a given temperature. For the temperature of the body, which is fixed, the ratio is 1 to 2100, that is, the percentage of the weight of the alcohol in a given volume of blood is always 2100 times the weight in the same volume of deep lung breath. The alcohol in 2100 cubic inches of a person's deep lung breath will equal the alcohol in one cubic inch of his blood at all times. Experiments by Dr. Harger and many others including the National Safety Council have confirmed these findings. ("Evaluating Chemical Tests for Intoxication," 1953. A report of committee on tests for intoxication, National Safety Council.)

In the course of his work, Dr. Harger developed three methods, including "Harger's micromethod," a laboratory method widely used by many, including the United States Army for their laboratory, since 1946. The second method is the drunkometer first described in a paper before the American Chemical Society, by Doctors Harger, Hulpieu and Lamb, in 1931, and again before the American Medical Association, in 1938. The third method is an attachment to the drunkometer so one can analyze urine and blood, and is called an aerometric procedure.

The first drunkometer was designed and built in 1931, and the present one in 1936. It was first used by the Indiana police in 1936, and is now used in thirty-eight States and twelve foreign countries.

The drunkometer simply analyzes the breath to determine whether alcohol is there and how much, and from that one can calculate the alcohol in the blood. Although Dr. Harger says that the method is so simple that an intelligent eighth grade student can after a week's training operate it without making any mistakes, usually individuals are selected who at least have had some science or equivalent to operate it.

The drunkometer is illustrated in the diagram opposite. For its operation a sample of the person's breath is collected in a previously unused rubber balloon immediately before the analysis. The balloon is then attached to a glass inlet tube which allows the breath to slowly bubble through a tube called a reagent or reaction tube. The reaction tube contains a purple colored chemical called potassium permanganate, the strength of which chemists designate as 1/20 normal, and a solution of sulphuric acid and distilled water, that is 56% acid and 46% distilled water, by weight. The purpose of the sulphuric acid in the reaction tube is to catch the alcohol from the breath bubbling through it.

The alcohol thus caught by the acid causes a chemical change in the color of the 1/20 normal potassium permanganate so that it fades to a color midway between the two sealed comparison tubes, which contain different colors. The color change is a decisive one marked by the disappearance of the initial purple color and the formation of a color midway between the two color standards in the color comparison tubes. This is known as the end-point, a procedure common in practice in analytical chemistry.

Exactly 1 cubic centimeter of 1/20 normal potassium permanganate solution in approximately 10 cubic centimeters of 56% sulphuric acid results in a purple solution, the color of which will be changed by 0.169 milligrams of alcohol caught by the sulphuric acid at the end-point color. The weight of alcohol measured to cause this color change is always the same. The amount of breath required to furnish this amount of alcohol will vary according to the concentration in the blood and therefore the breath.

The volume of ordinary expired breath needed to furnish 0.169 milligrams of alcohol measured in the reaction tube is then passed into a two-partitioned sealed container called a gasometer. The breath after the alcohol has been extracted in the reaction tube displaces the water in the upper half and causes it to fall to the lower chamber where it is measured by calibrations on the outer surface of the cylinder. If all the water

# THE DRUNKOMETER

A - BALLOON

B - REACTION TUBE

$C_{1-2}$ COLOR COMPARISON TUBES

D - DEHYDRITE TUBE

E.- ASCARITE TUBE

F - VALVE

G - GASOMETER

H - PINCH CLAMP

is displaced in the upper chamber the cylinder is inverted and the process continued.

The more intoxicated the person is the more rapidly the 0.169 milligrams of alcohol is caught and thereby the smaller is the volume of breath measured.

Since 2100 cubic centimeters of deep lung breath or 3200 cubic centimeters of ordinary expired breath contain the same weight of alcohol as 1 cubic centimeter of blood, the concentration of alcohol in a person's blood is calculated by the following formula: (In the present case 290 centimeters of water were displaced when the end-point color was reached.)

*Gasometer Formula*

*Conversion Factor —*
*Breath to Blood*

$$\frac{\text{Test Data of Subject}}{(\text{Volume measured in gasometer})} = \frac{0.169}{3200} = \frac{X}{3200}$$

or $\dfrac{0.169}{290} = \dfrac{X}{3200}$

but $0.169 \times 3200 = 541$

thus $\dfrac{541}{290} = X$

or 1.86 milligrams per cubic centimeter $= X$

But to convert to per cent division by 10 is necessary.

or $1.86 \div 10 = 0.186$ per cent

$= 0.19$ per cent
(corrected to hundredths)

The second quantitative method of measuring the volume of breath used in the test is to pass it through two tubes, the first called the "Dehydrite" tube containing magnesium perchlorate, which removes breath moisture, and a second called the "Ascarite" tube, which is a trade name of a granular tan preparation made by fusing potassium hydroxide on particles of asbestos, its purpose being to catch the carbon dioxide in the breath. This preweighed tube of Ascarite absorbs all the carbon dioxide in the breath. After the end-point is reached in the reagent or reaction tube, measuring the usual 0.169 milligrams of alcohol, the ascarite tube is removed and re-weighed. The increase in weight is the amount of carbon dioxide caught and since it is a known scientific fact that 3200 cubic centimeters of ordinary expired breath or 2100 cubic centimeters of deep lung breath contain 190 milligrams of carbon dioxide the amount of breath used can be determined.

Thus in the drunkometer method two end results are accomplished. First: a very definite amount of alcohol is measured. Second: the amount of ordinary expired breath necessary to furnish this alcohol is measured. With these two factors determined, the per cent of alcohol in the blood may be calculated.

In the present case by using the ascarite tube formula the blood alcohol content of 0.19% was arrived at as follows:

*Ascarite Formula*

$$\frac{\substack{\text{\textit{Test Data of Subject}} \\ 0.169 \text{ mg alcohol}}}{\substack{16.9 \text{ mg } CO_2 \quad \text{Difference in weight} \\ \text{Ascarite tube before} \\ \text{and after}}} = \frac{\substack{\text{\textit{Conversion Factor —}} \\ \text{\textit{Breath to Blood}} \\ X.(\text{mg alcohol in 1 cc of blood})}}{190 \text{ mg } CO_2}$$

but $.169 \times 190 = 32.1$

therefore $\dfrac{32.1}{16.9} = X$ or 1.9 mg alcohol in 1 cc of blood

(To convert mg/cc to per cent, divide mg/cc by 10)
or End result $X = 0.19$ per cent blood alcohol.

In 1941, the State Legislature, acting upon recommendations of the American Medical Association, the National Safety Council and the American Bar Association amended subdivision 5 of section 70 of the Vehicle and Traffic Law, effective July 1, 1941, by providing therein: " For the purposes of this section (a) evidence that there was, at the time, five hundredths of one per centum, or less, by weight of alcohol in his blood, is prima facie evidence that the defendant was not in an intoxicated condition; (b) evidence that there was, at the time, more than five-hundredths of one per centum and less than fifteen-hundredths of one per centum by weight of alcohol in his blood is relevant evidence, but it is not to be given prima facie effect in indicating whether or not the defendant was in an intoxicated condition; (c) evidence that there was, at the time, fifteen-hundredths of one per centum, or more, by weight of alcohol in his blood, may be admitted as prima facie evidence that the defendant was in an intoxicated condition." (See N. Y. Leg. Doc., 1953, No. 25; Journal of Amer. Med. Assn. Vol. 124, p. 1292, Apr. 29, 1944, and National Safety Council's Report of Committee on Tests for Intoxication, 1938.)

These percentages were arrived at after years of research and many thousands of tests by many scientists on both humans

and animals in the United States and various parts of the world. Tests were made on people of various sizes, ages and weights, consuming various quantities and kinds of alcohol under various conditions.

The effects were measured as to (A) " Reaction time " or the time needed for the muscles to obey the brain: i.e., if a person with alcohol in his brain is driving a car, it will take a longer time for him to apply the brakes in an emergency. (B) " Warped judgment " or the inability to draw proper conclusions after reasoning. First, the driver usually sees the world through " rose-colored glasses." He develops a false feeling of happiness and importance. He feels as though he were sitting on top of the world. (He will take chances on the road such as passing on curves and speeds and " cuts in " in heavy traffic.) (C) Loss of inhibitions: our inhibitions are normal brakes — alcohol in the brain removes the inhibitions when one might do things to harm himself. (Driver takes a chance, will pass through red lights, etc.) (D) Poorer vision: i.e., objects are not seen clearly and he views things imperfectly. (E) Clumsiness of muscular action: i.e., muscles fail to obey the brain in an accurate manner. (Steers all over the road.) (F) Final stage — complete helplessness: when the concentration of alcohol in the brain becomes high and reaches about 0.40% or 0.50% most people become unconscious. (" Effects of Alcohol Drinks, Tobacco, Sedatives, Narcotics " by Rice and Harger, Wheeler Pub. Co., 1949, 1952. See, also, Bjerver and Goldberg, Vol. 11, pp. 1–30, March, 1950, Quarterly Journal of Studies on Alcohol.)

Dr. Harger testified that the middle zone, i.e., between 0.05 and less than 0.15, where many people may be intoxicated, was so established to protect those persons who are more resistant to alcohol than others or those who " carry their liquor better ", although in his opinion all are somewhat intoxicated and unfit to drive a car in the range above 0.10%. However, as to the third zone, i.e., 0.15% or higher, all persons are definitely intoxicated and unable to safely drive a car.

*Defendant's Point I.* I find the Harger drunkometer a scientifically reliable and accurate device for determining the alcoholic content of a defendant's blood for compliance with section 71-a of the Vehicle and Traffic Law of the State of New York. It has been so accepted in the courts of the other States of the United States. (*People* v. *Spears,* 201 Misc. 666; *Toms* v. *State,* 239 P. 2d 812 [Okla.]; *People* v. *Bobczyk,* 343 Ill. App. 504; *State* v. *Warren,* 75 Ariz. 123; *State* v. *Berg,* 76 Ariz. 96; *McKay* v. *State,* 235 S. W. 2d 173 [Tex.]; *Lombness* v. *State,* 243 P. 2d 389

[Okla.]; *Omohundro* v. *County of Arlington*, 194 Va. 773; *Willennar* v. *State*, 91 N. E. 2d 178 [Ind.]; *Guenther* v. *State*, 221 S. W. 2d 780 [Tex.].)

As was stated in *Toms* v. *State* (*supra*), at pages 821–822: '' This court is of the opinion, that we should favor the adoption of scientific methods for crime detection, where the demonstrated accuracy and reliability has become established and recognized. Justice is truth in action, and any instrumentality, which aids justice in ascertainment of truth, should be embraced without delay. But, this decision is not ours to make. We have no legislative powers or duties, but the legislature within its legislative powers and constitutional limitations may do so, possibly on the theory that it is within its police power to regulate the highways for the protection of the public. We believe, in the light of the foregoing, chemical tests by experts of body fluids as blood, urine, breath, spinal fluid, saliva, etc., under varying conditions have been approved as having gained that scientific recognition of infallibility as to be admissible in evidence.''

Much of the defendant's argument here applies to the weight of the evidence rather than its admissibility.

The constitutional questions raised have been disposed of unfavorably to the defendant in the *Matter of Schutt* v. *Macduff* (205 Misc. 43).

*Defendant's Point II.* In *Matter of Schutt* v. *Macduff* (*supra*, pp. 54–55), Mr. Justice EAGER merely held that part of section 71-a of the Vehicle and Traffic Law unconstitutional relating to the absence of provision for a hearing prior to revocation after refusing to submit to a test. He states: '' The particular statute, therefore, is held to be unconstitutional because of the failure to contain a provision limiting its application to a case where there has been a lawful arrest and in that there is no provision entitling the licensee to an ultimate hearing upon an adequate record before the final taking away of his license. This decision has to do with due protection of one against arbitrary or unlawful revocation of his driver's license, and, therefore, is not intended to and should not affect the practice established by the police in various municipalities or sections of the State of requesting one to submit to a chemical test where he has been duly arrested for driving while intoxicated, nor should it limit the lawful use of the results of such a test when voluntarily submitted to.''

The defendant testified: '' Q. When you were driven downtown and you came to the precinct at 54th Street, did they ask you to take a test? A. They didn't ask me. The detective just told

me — asked me if I want to take a test, yes. But he explained immediately that if I don't take the test that I will lose my license at that moment. So therefore I decided to take the test because I need the car badly.''

This could hardly be construed as duress. The detective merely stated that which is contained in the statute and which provision had not at that time been disturbed by the ruling in *Matter of Schutt* v. *Macduff*, 205 Misc. 43 (*supra*). There was no obligation on the part of the detective to warn the defendant — it was a gratuitous offering of information as to the provisions of the statute. The defendant was not bound to accept the information. As is pointed out in *Matter of Schutt* v. *Macduff* (*supra*), pp. 48, 50: '' It also seems clear that the constitutional privilege would not bar the use in the prosecution of the defendant of the results of a body fluid test even though taken while he was so drunk as to be confused or unconscious or otherwise in such a condition that it may not be said that he voluntarily consented thereto. * * * The licensee is expressly given the option of refusal.''

*Point III.* Defendant urges that while the statute provides that upon the request of the person tested, the results of such test shall be made available to him there is no provision for the furnishing full and complete figures as to volume of breath, weights of the ascarite tube before and after the test, readings of the gasometer and the mathematical computations.

Since it was not shown upon the trial that any demand was made by the defendant or his attorney of detective Osterburg or anyone for this information this point is untimely. While the word '' results '' is used in the statute I venture to say that the information suggested would be available and given to a defendant.

*Point IV.* Defendant urges that the statute is unconstitutional by reason of the failure to provide a provision for giving notice to a defendant of his right to have a physician of his own choosing administer a chemical test in addition to one by the police. No authorities in support of this contention are submitted. The statute does not require that any notice be given a defendant as to this right. It would seem that it is sufficient to say that all persons are presumed to know the law and are therefore presumed to be so informed as to this right. They should acquaint themselves, at least with those laws most likely to affect their usual activities. The point is without merit.

In conclusion I find the defendant guilty as charged.