Forrest W. Fortune *v*. State of Tennessee.

(*Nashville,* December Term, 1954.)

Opinion filed March 11, 1955.

James M. Manire and James R. Winchester, both of Memphis, for plaintiff in error.

Knox Bigham, Assistant Attorney General, for the State.

Mr. Justice Burnett delivered the opinion of the Court.

Fortune was indicted for the second degree murder of one Will Burrow and was convicted of involuntary manslaughter, with a prison sentence of not more than 3 years. It is from this conviction that the present appeal comes.

The prosecution grew out of an automobile accident which occurred about 6:00 o'clock on Highway 72, one and a half miles west of Collierville. The deceased was riding in an automobile driven by one Nolan. Nolan's automobile was traveling west on his right side of the highway at about 30 miles per hour. Fortune was driving his car in the same direction as that in which Nolan was going at a speed estimated from forty to forty-five miles per hour. Fortune drove his car into the rear of the Nolan car, knocking it approximately three hundred feet off the highway into a muddy field, and resulted in the death of Will Burrow. At the point where the accident happened the highway was straight and level with good visibility in either direction from the point of the accident of approximately 4/10 of a mile. The police officer who happened along just a few moments after the accident happened testified that he could detect a strong odor of alcohol on Fortune's breath. There were no walking or talking or other tests of the kind made for sobriety. The plaintiff in error was given a sobriety test by a technician at the police department in the City of Memphis by the use of a drunkometer machine which according to

his testimony showed .225 alcohol concentration in Fortune's blood.

The plaintiff in error admitted that he was the driver of the car at the time of this unfortunate accident but insisted that he was not under the influence of an intoxicant. He admitted that he had drunk six bottles of beer from 11:30 in the morning until 6:00 o'clock that night, or the time of the accident. One other officer stated that the plaintiff in error told him that he had 9 bottles of beer. The plaintiff in error stated that he pulled out to pass the Nolan car and that when he did so the lights of the approaching traffic blinded him and when he pulled back into his own lane he was unable to see the Nolan car because of this blindness. He insisted that this was the cause of the accident.

The prosecution is based on two theories: (1) that the plaintiff in error had consumed enough of an intoxicant to justify the jury in finding that what he had drunk had so affected him that he was guilty of an act malum in se and that thus his conviction was justified under the authority of *Crossway* v. *State,* 157 Tenn. 363, 370, 8 S. W. (2d) 486 and *Keller* v. *State,* 155 Tenn. 633, 299 S. W. 803, 59 A. L. R. 685 and other cases, and (2) that the proof in this case shows that the plaintiff in error pulled out of his lane of traffic into the face of oncoming traffic and that such an act in itself was malum in se as has been held by this Court in *Reed* v. *State,* 172 Tenn. 73, 110 S. W. (2d) 308, and *Smith* v. *State,* 196 Tenn. 168, 264 S. W. (2d) 803.

On the first ground of liability the State has conceded that the evidence on the use of the drunkometer test was objectionable under this record and not subject to be considered by the jury, but the State says that it has shown that the plaintiff in error smelled strongly of an

intoxicant. Of course the traditional method used over a period of years to establish drunkenness has been to place witnesses on the stand who smelled the breath and observed the suspect's appearance and conduct at about the time in question and have likewise tried to show that there were empty bottles, etc., around the scene of the accident. Obviously such proof is very credible but meets with much criticism and a scientific method has long been recognized as one that would be much better. In modern times of the high powered automobiles and the traffic on the roads if one does drive under the influence of an intoxicant it becomes indeed a very serious offense and thus it is necessary that this driver be eliminated from the road as much as possible. One, to drive a car, must have good judgment, his reflexes and vision must not be impaired by alcohol and if these things are impaired then they make this driver highly dangerous. To meet these objections to the establishment of drunkenness as indicated here when you merely have the smell of the breath, walking, etc., there have been several instruments and tests established to prove intoxication. One of these tests is the drunkometer test which was used in the instant case. This test (chemical test) is made by one qualified to do so taking a small specimen of the blood, saliva, urine or other body fluid of the accused, or a bag full of his breath. The concentration of alcohol in the body fluids or breath may be measured, and through given ratios the concentration of alcohol in the brain may then be scientifically established. See *People* v. *Kovacik,* 205 Misc. 275, 128 N. Y. S. (2d) 492, where an excellent and thorough discussion and description of the drunkometer, its purposes and accomplishments and means of offering its tests in evidence are fully, ably and thoroughly discussed.

This State seeing the need of some such scientific test and fearful that the tests might not be admissible in evidence, has passed a general act, Public Acts of 1953, Chapter 202, which establishes a rebuttable presumption of guilt if the blood of the accused is found to contain .15 per cent (by weight) of alcohol. This statute, Chapter 202 of the Public Acts of 1953, at least by implication, makes the finding of this .15 per cent by weight of alcohol in the blood as shown by chemical tests of the blood, urine or breath, a prerequisite to the raising of the presumption of intoxication. See excellent notes on subject, Tennessee Law Review, Vol. 23, No. 2, page 179. The Act makes this presumption non-conclusive but a rebuttable presumption and it expressly provides that other evidence may be introduced bearing upon the question whether or not the defendant was under the influence of an intoxicant within the prohibition of the Act. We think that what the Legislature meant by this presumption was that when it was shown by this scientific test that the accused had more than the .15 per cent of alcohol in his blood that then there was a prima facie case against the accused established which the accused might rebut by introducing other evidence. Then when this is done the presumption created by the chemical or scientific test is to be considered by the jury and court along with other evidence introduced as to whether nor not the accused is intoxicated.

As a whole the reported cases over the country hold that for these scientific test results to be introduced as evidence this evidence must come through professional experts to interpret these test results. See *State* v. *Haner,* 231 Iowa 348, 1 N. W. (2d) 91; *Lawrence* v. *City of Los Angeles,* 53 Cal. App. (2d) 6, 127 P. (2d) 931; *People* v. *Tucker,* 88 Cal. App. (2d) 333, 198 P. (2d) 941; *State* v. *Koenig,* 240 Iowa 592, 36 N. W. (2d) 765; *State* v.

*McQuilkin,* 113 Utah 268, 193 P. (2d) 433; *House* v. *State,* 1950, 155 Tex. Cr. R. 275, 233 S. W. (2d) 862; *Omohundro* v. *Arlington County,* 194 Va. 773, 75 S. E. (2d) 496. This requirement of course will curtail the use of these tests to a great extent as was so ably argued by the District Attorney General before the Court in the instant case. Thus it will become necessary that policemen and ordinary technicians in the police department be so qualified in conducting these tests that their testimony can be presented in court and the question then of the admissibility of their testimony will be largely a question of the weight to be given the testimony rather than the admissibility of the testimony. Thus when such witnesses are offered it will be a question of their credibility which of course is attacked by searching cross examination as to training, etc. It is a rule in this State that the requirements of expert testimony are not necessarily exacting; in fact they are very liberal and flexible. 7 Wigmore, Evidence, Sec. 1926 (3rd Ed. 1940). The courts of this State in the reception of expert evidence are allowed to admit the evidence largely in the discretion of the trial judge. *McElroy* v. *State,* 146 Tenn. 442, 242 S. W. 883. The Court in thus admitting expert testimony must see that the expert has some special as well as practical knowledge of the subject which he is testifying about and the court does not rule upon the trustworthiness of his testimony but merely on whether or not he has anything within his special knowledge which the ordinary juror would not know as well. *Moon* v. *State,* 146 Tenn. 319, 359, 242 S. W. 39. This trustworthiness as we have said above is to be left to be tested on cross examination. Thus, ''applying these liberal rules, a policeman or technician who has had training and experience in testing for alcohol in body fluids or breath would probably qualify as an expert wit-

ness." Tennessee Law Review, supra. Competent proof should be offered that the device is a proper one and in good and accurate order at the time it was used.

We think unquestionably that this is the correct statement of what the rule should be and so adopt it as the rule. Thus when this rule is adopted the various law enforcement departments can have certain trained individuals who would meet the ordinary tests of experts along this line and thus their evidence would be admissible, subject to discretion of the trial judge.

The plaintiff in error concedes that if the test taken in the case now before us had been shown to the trial court to have had a foundation or predicate showing that the device used was based on a scientifically approved theory and that this foundation and predicate were made with the device which "was accurate, properly supervised, its chemicals properly compounded or its identity established by expert testimony or otherwise", the testimony would have been unobjectionable. It is said that the reason that this testimony was objectionable was because there was no predicate or no foundation laid and no expert witness offered—the only witness offered on this behalf was a lay witness. The Assistant Attorney General at the Bar of this Court concedes that the evidence thus offered was erroneous but takes the position that even though this evidence is erroneous that under the Harmless Error Statute, Code Section 10654, that there is sufficient evidence in the record to support the conviction.

After a careful reading of the record we are satisfied that the evidence introduced on the drunkometer was not offered by one having a requisite knowledge of the operation of the drunkometer or its authenticity and we do not think that the trial judge so admitted this evidence.

It is argued that the trial judge in effect by admitting this evidence took judicial notice of the accuracy and reliability of this specific testing device. Of course if this is the theory upon which it is admitted it would be erroneous because at this time the machine or test used for this purpose was not so generally known or so "notorious" nor was the operation of the device "a practical application of scientific facts which are generally known or ought to be known". One of the best definitions of judicial knowledge or when the court should take judicial knowledge that we have seen is the following as taken from *People of City of Buffalo* v. *Beck,* (Radar as to speed car) 205 Misc. 757, 130 N. Y. S. (2d) 354, 356, as follows:

"In *People* v. *Gitlow,* 234 N. Y. 132, 143, 136 N. E. 317, 321, the court said: 'What the world generally knows a court of justice may be assumed to know.' Generally speaking, judicial notice may be taken of any fact which is of common notoriety. *People* v. *Snyder,* 41 N. Y. 397, 398; also *People* v. *Gitlow,* supra. The contrary of this is not so, however. A judge or juror cannot, in the name of judicial notice, substitute his own personal knowledge for evidence. There is a real distinction between a judge's personal knowledge as a private person or knowledge acquired by him as a judge upon another trial and his knowledge as a judge. As a judge he should ignore what he knows as an individual or knowledge which has come to him upon another trial in which evidence was given to bring about that knowledge. *Matter of Bonner's Estate,* 159 Misc. 511, 288 N. Y. S. 419. Of course, no fixed rule can be laid down declaring what will be judicially noticed. In a general way courts will no-

tice without evidence all facts that are part of the general knowledge of the country.''

Thus of course we cannot take judicial knowledge of the test or machine used in the instant case.

Then another good reason why this evidence is not competent is the inability of this lay witness to calculate and translate for the jury the reading from the machine in terms of the alcoholic content of the blood. It is pointed out that ''in order to do this, the witness had to rely upon a chart sent with the machine, and which he did not understand. The use of such a chart by the witness who could not explain the same, constituted hearsay evidence.'' Then too, to show that the chemist who compounded the chemicals used herein was a local chemist; it is shown that the witness testifying had no chemical knowledge; he was a high school graduate and was attending college and working part time. He had no knowledge in chemistry, physiology or things of the kind necessary to testify about what these tests produced, other than a two weeks training in operating the machine. Thus it would seem that this witness did not qualify.

As heretofore said the State insists that this sentence should be affirmed even though it concedes that the introduction of the evidence heretofore referred to, that of the drunkometer, is error, because it is said that there is no prejudice to the defendant by the introduction of this error, that it is harmless under Code Section 10654. We make no comment on the evidence introduced outside of the scientific tests made as to intoxication or the question of the driving of the car at the time aside from intoxication because as we see it the case must be remanded for a new trial. It would not be proper for us to comment on these things in view of this fact. We do think that the introduction of this evidence under

this record constituted prejudicial error. One reading the record readily sees that the bone of contention throughout was what this scientific test showed. It was shown to the jury by this lay witness that the test showed that the alcohol in the blood of the plaintiff in error was .225 per cent. The statute making it what we have construed as a prima facie case to have in the blood in excess of .15 per cent was charged to the jury. The only evidence of intoxication aside from this was a statement of the arresting officer and others that they smelled the intoxicant on the man's breath. There were none of the other usual things as spoken about heretofore to connect up intoxication aside from the scientific test used. This being the burden of the trial below we think that unquestionably it constituted reversible error. We certainly could not say that aside from this the jury would have convicted the plaintiff in error anyway. It is true that they might have, we are not commenting on that fact one way or the other at this time. For the reasons herein stated the case is reversed and remanded for a new trial.