64 N.J. Super. 262 (1960)
165 A.2d 829
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOHN S. MILLER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 1, 1960.
Decided November 25, 1960.
*264 Before Judges GAULKIN, SULLIVAN and FOLEY.
Mr. Ronald Picinich argued the cause for appellant (Mr. John J. Cariddi, of counsel).
Mr. William C. Brudnick, Special Assistant Prosecutor, argued the cause for respondent (Mr. Guy W. Calissi, Bergen County Prosecutor, attorney).
The opinion of the court was delivered by GAULKIN, J.A.D.
Defendant was convicted in the Municipal court, and upon trial de novo in the County Court, of operating a motor vehicle while under the influence of intoxicating liquor, in violation of N.J.S.A. 39:4-50. Now he appeals to this court, upon the grounds that (1) the result of a Drunkometer test was improperly received in evidence and used by the County Court as a basis for its decision, and (2) without that testimony the evidence was not sufficient to prove defendant guilty.
The State says, in its answering brief, that "the opinion of the court below clearly establishes that the basis of its *265 finding of guilty rested upon `very heavy testimony of the people who observed' defendant rather than the Drunkometer finding and its presumption." If the trial court had plainly said that the evidence other than the Drunkometer testimony established defendant's guilt, and we agreed, we would not reach the question of the reception of the Drunkometer testimony.
However, we cannot say with assurance, after reviewing the testimony and the opinion of the County Court, that the Drunkometer evidence did not influence its conclusion of guilt. For example, the doctor who examined defendant at the request of the police, after stating that he came to police headquarters "to examine him, to see if he were fit to drive an automobile," testified that "his eyes were not remarkably significant," though "the pupils were somewhat sluggish"; his reflexes were "not abnormal," and he could repeat "the words I asked him * * * pretty well" though "he was unable to walk a straight line without holding on to the wall"; and that "I concluded he had been drinking," (which defendant never denied) but "I didn't come to any definite conclusion as to whether he was fit or unfit to drive an automobile." Of course, the test is not fitness or unfitness to drive an automobile, but rather whether the defendant "has imbibed to the extent that his physical coordination or mental faculties are deleteriously affected." State v. Emery, 27 N.J. 348, 355 (1958). The prosecutor did not ask the doctor, nor did the doctor say, whether the defendant was under the influence of intoxicating liquor, either in the terms of State v. Emery or otherwise. On cross-examination the doctor testified:
"Q. * * * And you have no opinion as to whether or not he was under the influence of liquor or beer? A. Well, he was drinking. I have no opinion as to whether he was fit or unfit to drive, no."
Even in a trial without jury, "a defendant should not be required to contend with inadmissible evidence, *266 where it appears that it may have a prejudicial effect," State v. Hintenberger, 41 N.J. Super. 597, 604 (App. Div. 1956); and a new trial must be granted where "it is pure speculation as to whether the court in reaching its determination" disregarded it, State v. Dietz, 5 N.J. Super. 222 (App. Div. 1949). Cf. State v. Hulsizer, 42 N.J. Super. 224, 229 (App. Div. 1956). We must therefore deal with the Drunkometer testimony.
Joseph Wolkamir testified that he was a state trooper "stationed at the Pompton Lakes station," and that he was "also a Drunkometer operator." Then (after several pages of testimony which had nothing to do with the Drunkometer except his statement that defendant had refused to take the Drunkometer test until his own doctor arrived), he testified as follows:
"Q. Now, Officer, subsequent to this time, when you completed the oral and physical examination, did you give this defendant a Drunkometer test? A. I did, sir.
Q. And at what time did that test take place? A. At  I was preparing to leave, when the defendant requested a Drunkometer test.
At 2:37 A.M. the test was given to the defendant. It was completed at 2:40 A.M., with a reading of .21.
Q. And what did this test consist of? A. This was by use of the Drunkometer, a chemical test to determine the amount of alcohol, thereby determining, under the Statute, whether the defendant is fit or unfit to operate a motor vehicle.
Q. And what was the reading, sir? A. .21%.
Mr. Ryan: No further questions, Officer. Thank you very much.
The Court: Cross examination.
Mr. Cariddi: If your Honor please, I make application to the Court at this time to strike from the records, that your Honor not consider any evidence pertaining to the result of the Drunkometer, for the simple reason that the State has failed to lay a proper foundation to qualify the Trooper as an expert; and secondly, secondly 
The Court: I note your objection on his part to giving testimony.
Mr. Cariddi: * * * I move at this time that * * * that portion of his testimony, be stricken from the record. He hasn't been qualified, and there is no evidence as to how he arrived at the result, except that the result was .21.
The Court: I'll deny your motion."
*267 The State contends that these objections came too late.
As we have seen, there were two separate grounds of objection: (1) that there was no showing that the trooper was qualified, and (2) no evidence "as to how he arrived at the result," which we understand to mean as to how the test was conducted. Had the only objection been to the trooper's qualifications, it could perhaps be argued with some grace that defendant's objection came too late. Precipio v. Insurance Company of Penn., 103 N.J.L. 589, 594 (E. & A. 1927); State v. Greul, 59 N.J. Super. 34, 39 (Cty. Ct. 1959); but compare Electric Park Co. v. Psichos, 83 N.J.L. 262, 265 (Sup. Ct. 1912), and see Polulich v. J.G. Schmidt Tool Die & Stamping Co., 46 N.J. Super. 135, 143 (Cty. Ct. 1957). But the same argument may not justly be made against the second objection. To begin with, it must be noted that the statement "with a reading of .21" was volunteered by the trooper  the question which had been asked of him was "at what time did that test take place?" True, defense counsel should have moved to strike that statement then, but the next question "and what did this test consist of?" appeared to go forward toward the supplying of the basis for the .21 reading. The answer given by the trooper did not describe the test, and therefore defense counsel should have urged his objection when the following question  "and what was the reading, sir?"  was asked, and before it was answered. However, the question merely called for a repetition of the answer previously volunteered, and he did voice his objection to the judge immediately after the trooper repeated ".21%" and the prosecutor announced he had no further questions.
The Chemical Tests For Intoxication Manual prepared by the Committee on Medicolegal Problems of the American Medical Association (1959) says (p. 30) that:
"Under properly controlled conditions, which include proper training and continuing expert supervision of competent operators and adequate expert control of equipment, reagents, and procedures, the on-the-spot tests are also capable of yielding accurate breath alcohol *268 concentration results, acceptable as an index of blood alcohol concentration of adequate reliability for clinical and legal purposes."
In a symposium on "Breath Alcohol Tests," reported in 5 Journal of Forensic Sciences 395-444 (1960), Robert F. Borkenstein, Chairman, Department of Police Administration, Indiana University, said (p. 400): "Obtaining appropriate breath for analysis is the basic problem in breath tests" and (p. 402) "The Drunkometer is as reliable as the training of the operator and the care in preparation and maintenance of the solutions."
Therefore, considering the brevity of the examination and the emptiness of the answers, the court should have honored the objection, even if not absolutely timely, and should have required the State to supply the foundation testimony. Cf. State v. Hunter, 4 N.J. Super. 531, 536 (App. Div. 1949); Electric Park Co. v. Psichos, supra; Polulich v. J.G. Schmidt Tool Die & Stamping Co., supra. State v. Greul, supra, is not to the contrary, for there defendant did not voice his objection until after the State had rested. Compare, also, State v. Dantonio, 18 N.J. 570, 580 (1955) where the Supreme Court, dealing with "radar speedmeter" readings, said:
"The defendant points out that there was no affirmative evidence introduced by the State to establish that the speedometers in the Troopers' cars had been recently tested. It would, perhaps, have been the better course for the State to have introduced such testimony and presumably it would have done so if the defendant had raised the point in due time before the close of the trial."
The Drunkometer is sufficiently established and accepted as a scientifically reliable and accurate device for determining the alcoholic content of the blood to admit testimony of the reading obtained upon a properly conducted test, without any need for antecedent expert testimony by a scientist that such reading is a trustworthy index of blood alcohol, or why. Chemical Tests For Intoxication Manual, supra; 5 Journal Of Forensic Sciences, supra, at *269 pp. 395-444; Donigan, Chemical Tests and the Law (1957); M.C. Slough and Paul E. Wilson, "Alcohol and the Motorist: Practical and Legal Problems of Chemical Testing," 44 Minn. L. Rev. 673 (1960); 5A Am. Jur., Automobiles and Highway Traffic, § 1247, p. 1009; Annotation; 159 A.L.R. 209; Alexander v. State, 305 P.2d 572, 586 (Okla. Cr. 1956); People v. Kovacik, 205 Misc. 275, 128 N.Y.S.2d 492 (Sp. Sess. 1954); State v. Olivas, 77 Ariz. 118, 267 P.2d 893 (Sup. Ct. 1954); People v. Bobczyk, 343 Ill. App. 504, 99 N.E.2d 567 (App. Ct. 1951). Contra, People v. Morse, 325 Mich. 270, 38 N.W.2d 322 (Sup. Ct. 1949). N.J.S.A. 39:4-50.1 recognizes that the amount of alcohol in a defendant's blood may be shown "by chemical analysis of * * * breath."
Of course, testimony based on Drunkometer readings, whether given by police officers or scientists, is not conclusive. N.J.S.A. 39:4-50.1. Cf. State v. Dantonio, supra, 18 N.J., at pp. 578-580; Ross v. Marx, 24 N.J. Super. 25, 26 (App. Div. 1952), certification denied, 14 N.J. 466 (1954). There are those who dispute the reliability of Drunkometer readings as an accurate index of blood alcohol, and admittedly there is possibility of error, but, as of the present time, the Drunkometer is so well established that these considerations do not affect the admissibility of the Drunkometer evidence but simply affect its weight. Cf., State v. Greul, supra; State v. Dantonio, supra; Ross v. Marx, supra.
This brings us to the question of what is an adequate foundation for the introduction of the reading obtained upon a Drunkometer test. Here it must be borne in mind that breath testing as an index to blood alcohol is an advancing science. Only 11 years ago Judge (now Justice) Brennan said in State v. Hunter, supra, 4 N.J. Super., at p. 538:
"The Harger test is rooted in a technology seemingly not fully understood at this time by any except the technicians who developed it and certainly having the flavor of the esoteric to the uninitiated." *270 Since that time the Drunkometer and the technique of its use apparently have been and continue to be improved. In this connection, it is interesting to note that in said symposium, at p. 410, Dr. Glenn C. Forrester said:
"I cannot help but feel that at least part of the research that has gone into the development of the `perfect' breath analyser of today from the `perfect' breath analyser of twenty years ago has been stimulated by the objections raised in the courtroom during this period."
As an example of these continuing changes in Drunkometer technique, it was said in the "Breath Alcohol Tests" symposium above mentioned, at p. 400, that "In 1956 Harger reported a variation of the Drunkometer method using rebreathed air, an analytical simplification of his method." It would therefore be unwise for us to attempt to specify precisely what proof the State must adduce before the technician who gave the test may testify as to the reading. As a minimum, however, the State should prove (unless such proof is waived) that the operator was qualified, that the machine and its components were in proper condition, and that the test was properly administered. Whether more shall be required in a given case as a foundation for the admission of the operator's testimony must be left to the trial judge upon the basis of the facts and issues in the particular case.
Of course, the mere fact that the testimony of the operator is admitted does not mean that the trial court will always find that it is sufficient, standing alone, to prove guilt beyond a reasonable doubt. As Dr. Robert B. Forney, a collaborator with Dr. Harger in many of his researches, said in the above mentioned symposium (p. 409):
"Lawyers are obligated by their professional integrity to establish the validity of any given breath test for alcohol when the results of such test are to be used as evidence against a client they are representing. This must and should be accomplished by diligent searching interrogation.
None of the breath tests currently employed can be better than the individual operating them. The success of the entire chemical *271 test for intoxication program must depend on the competency of the operators, not only to perform the tests correctly but to withstand legitimate cross-examination."
For the foregoing reasons the judgment is set aside and the case is remanded to the County Court for a new trial, at which, of course, the State may present not only proper Drunkometer testimony, but may re-present the entire case.