CITY OF SIOUX FALLS, Respondent v. KOHLER, Appellant

(118 N.W.2d 14)

(File No. 9944. Opinion filed November 20, 1962)

**T. R. Johnson,** Sioux Falls, for Defendant and Appellant.

**Robert S. Golden,** City Atty., **John E. Burke,** Deputy City Atty., **Paul E. Mundt,** Asst. City Atty., Sioux Falls, for Plaintiff and Respondent.

HANSON, J. This is an appeal by defendant from a conviction in the Municipal Court of Sioux Falls for driving a motor vehicle while under the influence of intoxicating liquor contrary to an ordinance of said city.

On February 8, 1961 defendant collided with a parked car on Main Avenue in the City of Sioux Falls. Following the collision defendant was taken to the Police Station where he voluntarily consented to take an Intoximeter test. The test was administered by Police Lt. Merle Renli.

The word Intoximeter is the trade name for a scientific breath testing device perfected by Dr. Forrester in 1941. Like the Drunkometer, Alcometer, and Breathalyzer it operates on the assumption that the concentration of blood alcohol bears a fixed relation to the concentration of alcohol in the deep lung, or alveolar air. See Vol. 6 Am.Jur. Proof of Facts, p. 497, et seq. for description in detail. The Intoximeter operates by trapping a subject's breath in a rubber balloon. The trapped air is then filtered out of the balloon over a chemical train. One tube in the train containing magnesium perchlorate absorbs alcohol and moisture. Another tube, referred to as the ascarite, absorbs carbon dioxide. By quantitatively weighing and analyzing such residue a trained chemist is able to calculate the blood alcohol content of the subject according to a fixed mathematical formula. Our statutory presumptions of intoxication are based upon this chemically determined ratio of blood alcohol. SDC 1960 Supp. 44.0302-1. The Sioux Falls City Chemist, Harry Falconer, analyzed the test given defendant and testified the results indicated a blood alcohol concentration of .28. The propriety and admissibility of such scientific evidence is not questioned and is not in issue here. There is, however, another separate step in the Intoximeter test. It is referred to as the decolorization or color change test. It involves another tube in the chemical train containing potassium permanganate which is purple in color. Alcohol reacts upon this chemical by fading its color. The rate of decolorization furnishes an approximation of

alcoholic concentration in the breath. No color change indicates absence of alcohol. This phase of the Intoximeter test furnishes law enforcement officers with an on-the-spot means of determining whether or not a person has been drinking intoxicating liquor.

At the trial Lt. Renli identified Exhibit 2 as the Intoximeter used in testing defendant. Such exhibit includes a yellow and green packing carton in which the testing device is enclosed. The outside of the carton is covered with pictorial and printed advertising matter. For example the word "Intoximeter" appears in large letters over a picture of a motorist blowing up a balloon in the presence of a law enforcement officer. A wrecked car is in the background. Underneath the picture are the words "On-the-spot testing for Alcoholic Influence." The following printed statement also appears on both the upper and lower portions of such carton:

"Data from tests reported by the Committee on Tests for Intoxication of the National Safety Council show the Intoximeter test results to agree more perfectly with blood analyses than any other breath testing method available."

A sealing wrapper affixed to the outside of the carton contains data reported by the testing officer, Lt. Renli. It shows defendant's decolorization time was 32 seconds. In addition, Exhibit 2 includes a separate yellow sheet of testing procedure directions. Included is a so-called "Interpretation of Decolorizing Time." So far as material here this color change chart shows the following ranges of alcoholic influence reflected by rate of decolorization:

"Zone: up to 25 seconds—very strong alcoholic influence; percentage probably ranging upwards from .20%.

"Zone: 25 to 40 seconds—undoubted alcoholic influence; percentage probably ranging from around .15 to .20%."

Lt. Renli gave a step-by-step demonstration to the jury of testing procedures used in administering the Intoximeter test to defendant. He used Exhibit 3 for this purpose which was a fresh, or

unused, Intoximeter. Exhibits 2 and 3 were admitted into evidence over defendant's objections. In our opinion both exhibits should have been excluded and their admission constitutes reversible error.

Like "Drunkometer" the trade name "Intoximeter" itself carries with it a self-serving implication. This was pointed out by the New York Court in People v. Davidson, 5 Misc.2d 699, 152 N.Y.S.2d 762, 765, as follows: "the very name of the device—'Drunkometer'—might very well be misinterpreted to mean that only those who were 'drunk' or intoxicated were to be tested by it; that the very name somehow lent weight to the result which it produced. * * *" The self-serving implication arising from the name "Intoximeter" should not be further highlighted in the minds of the jury by an aura of infallibility created by unsupported advertising claims. The most damaging portion of Exhibit 2, however, is the color change chart and testing officer's return showing defendant's decolorization time. According to the chart a color change of 32 seconds shows "undoubted alcoholic influence" with a "percentage probably ranging from around .15 to .20%." There is no supporting proof that such phase of the Intoximeter test is a reliable or scientifically accurate gauge of blood alcohol. It was clearly hearsay as to defendant and self-serving as to the City. Hill v. State, 158 Tex.Cr.R. 313, 256 S.W.2d 93; Fortune v. State, 197 Tenn. 691, 277 S.W.2d 381; and State v. Gregoire, 88 R.I. 401, 148 A.2d 751. Assuming that Lt. Renli was qualified to administer the Intoximeter test his meager training certainly did not otherwise qualify him as an expert in the use or results of that highly technical scientific device.

In view of our conclusion on this evidentiary point it is unnecessary to consider other assignments of error urged by defendant as they may not be relevant in a new trial.

Reversed.

RENTTO, P. J., and ROBERTS and SMITH, JJ., concur.

BIEGELMEIER, J. (dissenting). Lt. Renli in answer to a question that this was an on-the-spot test and did not purport to be a scientific portion, testified it was what they called only a "field test," to distinguish between a person who had "nothing

to drink" and a person who had "something to drink." This is of the same tenor as the printed item on Ex. 3 headed "Some Key Points" which states as to the interpretation of Decolorization Time: "Remember this gives an **approximate** % only. The **chemist** will determine the exact % for **evidence."** (Emphasis supplied)

It was an early step only to determine if there was alcohol present at all and an approximate per cent. The exhibit specifically stated the chemist would determine the exact per cent of alcohol for evidence.

To furnish this evidence, as required by both Lt. Renli's testimony and the printing on Exhibits 2 and 3, Falconer, the city chemist, in minute detail described the Intoximeter breath test and without objection the determination for alcoholic content showed results within one and two-hundredths of a per cent accuracy with direct blood tests; that defendant's test revealed an alcoholic content of .28% which could vary from .26% to .30% from a blood test. His written notations on Exhibit 2 merely duplicated his other oral testimony. The percentages were all greater than the "approximate" ones indicated by the field test color change.

The three cases cited in the majority opinion refer to the "results" of the test; here the result is in evidence without objection, and the objection is directed to the apparatus. The Davidson case quotation is dictum from a New York County Court opinion. In Jackson v. State, 1953, 159 Tex.Cr.R. 228, 262 S.W.2d 499, that court held it was not error to admit testimony by an officer with two days' training in the use of an Intoximeter, (the same device involved here) as to the color change being indicative of the subject's intoxication, where as here, the Intoximeter was then sent to a laboratory for accurate testing as to result. The court after citing Hill v. State, 1953, 158 Tex.Cr.R. 313, 256 S.W.2d 93, said "The test here involved is entirely different." In 1961 that court adhered to the Jackson holding saying it "authorizes the testimony of Officer Shetler as to the results of the visual preliminary color change test * * *." Larue v. State, 1961, Tex.Cr.App., 352 S.W.2d 118.

Cases dealing with the Drunkometer and other similar devices for determining the alcoholic contents of the breath wherein the evidence was held properly admitted, some of which contain extensive discussions of the subject are: People v. Bobczyk, 1951, 343 Ill.App. 504, 99 N.E.2d 567; State v. Olivas, 1954, 77 Ariz. 118, 267 P.2d 893; State v. Miller, 1960, 64 N.J.Super. 262, 165 A.2d 829; Toms v. State, 1952, 95 Okl.Cr. 60, 239 P.2d 812; City of Wichita v. Showalter, 1959, 185 Kan. 181, 341 P.2d 1001; Omohundro v. Arlington County, 1953, 194 Va. 773, 75 S.E.2d 496 and 44 Minn.L.R. 673 (1960).

This was not a criminal action or prosecution. SDC 1960 Supp. 34.2901; City of Redfield v. Wharton, 79 S.D. 557, 115 N.W.2d 329; see also SDC 1960 Supp. 34.33; City of Sioux Falls v. Famestad, 71 S.D. 98, 21 N.W.2d 693 and City of Sioux Falls v. Christensen, 79 S.D. 633, 116 N.W.2d 389. It was for this reason in the last cited case the court was required to conclude SDC 1960 Supp. 44.0302-1, the presumption of intoxication statute, did not apply to city ordinance violations because the legislature expressly limited it to criminal prosecutions. A proper balancing of the rights of a defendant and those of the growing number who crowd the highways need not deter courts in accepting scientific advances as evidence.

To declare it prejudicial error to admit these exhibits seems to unduly circumscribe officials in enforcing the law on drunk driving when not so determined in former decisions. State v. Guy, 25 S.D. 144, 125 N.W. 570; State v. Jerke, 73 S.D. 64, 38 N.W.2d 874. It seems to be the concensus of medical opinion that less than 0.15 per cent of alcohol definitely impairs the driving ability of all persons. See authorities above and article by Horace E. Campbell, M.D., in A.B.A.J. 46 (1960). I do not believe it prejudicial error to admit the exhibits in evidence and for that reason am unable to concur in the court's opinion.