[Civ. No. 33131.   Second Dist., Div. Three.   May 28, 1969.]

JAMES F. COVINGTON, Plaintiff and Appellant, v. THE MUNICIPAL COURT OF THE LOS ANGELES JUDICIAL DISTRICT OF LOS ANGELES COUNTY, Defendant and Respondent; THE PEOPLE, Real Party in Interest and Respondent.

Gilbert C. Alston for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Roger Arnebergh, City Attorney, Philip E. Grey, Assistant City Attorney, and Michael T. Sauer, Deputy City Attorney, for Real Party in Interest and Respondent.

FORD, P. J.—This is an appeal from a judgment of the Superior Court of Los Angeles County denying a petition for a writ of prohibition to restrain a trial in the municipal court.

The nature of the issue involved is disclosed by the findings of fact of the trial court which are in part as follows: 1. There is presently pending in the municipal court a criminal prosecution wherein the petitioner Covington is charged with a violation of section 23102, subdivision (a), of the Vehicle Code,[1] the issue therein being "the state or degree of intoxication, if any, of the petitioner as defendant therein." 2. The arrest of the petitioner occurred on September 17, 1967, at which time the petitioner was offered his choice of a blood, urine or breathalyzer test to determine the amount of alcohol in his blood and he was informed that his failure to submit to such a chemical test could result in the "revocation" [suspension] of his operator's license by the Department of Motor Vehicles.[2] Petitioner took the breathalyzer test. 3. "The administration of the test requires the use of two ampoules containing potassium dichromate in sulphuric acid solution. The top part of one of the ampoules is broken off so that a glass bubbler may be inserted into the ampoule. After the petitioner took the breathalyzer test, the ampoule with the top removed was destroyed in good faith and in accordance with the standard procedure of the Los Angeles Police Department." 4. Petitioner never requested the police officer who administered the breathalyzer test to save the ampoules used in the test. 5. Petitioner made a pretrial discovery motion to examine the "'chemical substances utilized by the Los Angeles Police Department in administering a test of petitioner's breath following his arrest.'" The municipal court denied the motion on October 30, 1967. 6. "A chemical analysis of the ampoule into which petitioner's breath was introduced would have revealed the alcoholic content of petitioner's breath and

[1]Section 23102, subdivision (a), of the Vehicle Code is in part as follows: "It is unlawful for any person who is under the influence of intoxicating liquor, or under the combined influence of intoxicating liquor and any drug, to drive a vehicle upon any highway."

[2]Section 13353, subdivision (a), of the Vehicle Code is in pertinent part as follows: "Any person who drives a motor vehicle upon a highway shall be deemed to have given his consent to a chemical test of his blood, breath or urine for the purpose of determining the alcoholic content of his blood if lawfully arrested for any offense allegedly committed while the person was driving a motor vehicle under the influence of intoxicating liquor. The test shall be incidental to a lawful arrest and administered at the direction of a peace officer having reasonable cause to believe such person was driving a motor vehicle upon a highway while under the influence of intoxicating liquor. Such person shall be told that his failure to submit to such a chemical test will result in the suspension of his privilege to operate a motor vehicle for a period of six months. [ ¶ ] The person arrested shall have the choice of whether the test shall be of his blood, breath or urine."

through correlation his blood alcohol." 7. "A deterioration of the contents of the ampoule during storage would have resulted in a test more unfavorable to petitioner than the original test." 8. Storage of the ampoule could have been done in such a manner as to minimize any deterioration without undue expense or hardship on the part of the People. 9. It is the practice of the Los Angeles Police Department to store and preserve until the time of trial blood and urine samples taken pursuant to the provisions of sections 13353 and 13354 of the Vehicle Code. The People made no showing upon the hearing of the petition that the preservation of the ampoules used in connection with the breathalyzer "would be any more difficult or expensive."

Pertinent conclusions of law of the trial court are as follows: 1. "Absent Vehicle Code Section 13354(c), petitioner would have had no right to have a chemical analysis of the ampoule."[3] 2. "Vehicle Code Section 13354(b) gives petitioner ample opportunity to protect his rights and obtain necessary evidence.[4] This is all that is necessary to show 'due process.'" 3. "Vehicle Code Section 13354(c) requires that 'full information' be given 'upon request of the person tested.' Full information can mean only that available to the person to whom the request is made."[5] 4. "Full information might well include the right to observation and chemical analysis of the ampoule were the ampoule available when the request was made." 5. "Where petitioner has been unable to show that the ampoule was in existence when requested or that it was destroyed in bad faith to defeat such a request, there is no denial of due process."

At the hearing in the superior court of the petition for a writ of prohibition to restrain the trial in the municipal court the petitioner offered no testimony. The deputy city attorney

---

[3]Subdivision (c) of section 13354 of the Vehicle Code is as follows: "Upon the request of the person tested full information concerning the test taken at the direction of the peace officer shall be made available to him or his attorney."

[4]Subdivision (b) of section 13354 of the Vehicle Code, as it existed in 1967, was as follows: "The person tested may, at his own expense, have a physician, registered nurse, duly licensed clinical laboratory technologist or clinical laboratory technician or any other person of his own choosing administer a test, in addition to any administered at the direction of a peace officer, for the purpose of determining the amount of alcohol in his blood at the time alleged as shown by chemical analysis of his blood, breath or urine. The failure or inability to obtain an additional test by a person shall not preclude the admissibility in evidence of the test taken at the direction of a peace officer."

[5]See footnote 3 of this opinion.

stated that the position of the People was that the ampoule was no longer in existence and hence could not be furnished to the petitioner.

The People called as a witness Officer McClain who had administered the breathalyzer test to the petitioner on the night of his arrest. The officer gave the following description as to the manner in which the test is given: "A. Well, the machine is warmed up to a certain temperature. It has been three months since I have given a breathalyzer test; so, I do not recall the temperature, but it remains at this constant temperature during the operation. There is an ampoule of an acid, a liquid, that is broken open and connected to the machine, and air is flushed through the machine to clear it from any previous tests. Q. This ampoule of acid, does the breath sample go into that ampoule? A. The air, after it goes into the machine, yes. Q. At the time that you broke the ampoule, did Mr. Covington ask you to save that ampoule? A. No, he didn't. Q. What happened to the ampoule of acid after the test was administered? A. At the conclusion of the test the ampoule is taken away and thrown away. Q. Is that what happened to the ampoule in Mr. Covington's case? A. Yes. Q. Mr. Covington did not choose to take either a blood test or a urine test? A. No, he didn't. THE COURT: In the breathalyzer test, how do you determine the alcohol content? Is there a chemical residue? THE WITNESS: No, your Honor, at the conclusion of the test a red colored light comes on to indicate the test has been concluded. There is a dial indicator, and you have a small knob that you turn, and the dial registers on zero. At this time there is an ink pointer that makes a mark on the card where the indicator has gone to, and it gives the percentage of alcohol. . . . BY MR. SAUER [deputy city attorney] : Q. The only record of the test is a rubber stamp on a piece of paper? A. Yes."

On redirect examination Officer McClain testified as follows: "Q. Officer, would you describe the ampoule that the liquid is in. A. It is a small glass ampoule, approximately an inch and a half high, I believe; and the top is sealed by glass which you break prior to giving the test. THE COURT: Is it placed in any particular part of the machine; I mean, is there a gauge that operates on the ampoule or anything of that nature? THE WITNESS: Your Honor, there is a tube that goes down into the liquid."

The People also called as a witness a forensic chemist employed by the Scientific Investigation Division of the Los

474

Angeles Police Department. That witness, Mr. Bassett, described the function of the breathalyzer as follows: "A. Yes, sir. The breathalyzer instrument is designed to measure the amount of alcohol in the breath; that is, the breath air from the deep lungs, and then to correlate this measurement by means of a calibrated scale with the amount of blood alcohol. The instrument is photoelectrically balanced or zeroed, both before and after the breath air test reaction. . . . . A. After the initial zeroing is accomplished, the operator then takes the breath air sample, and this is done by means of a stainless steel cylinder and piston arrangement, and it is passed on around into the test ampoule. THE COURT: Where does that breath air come from; does that come directly from the person being tested, or has that previously been blown into some other type of container? THE WITNESS: It goes directly into the instrument cylinder, and from the cylinder it is passed around to the test ampoule itself. BY MR. SAUER: Q. Officer, just to clarify the Court's question, the little mouthpiece at the top, does the man, does the individual using the machine blow directly into that mouthpiece? A. Yes, sir, he blows into the mouthpiece. Q. Thank you. A. This is a picture of the hose. This shows in the photograph the hose and the control apparatus. The valve control for the apparatus catches the air sample. The ampoule itself contains a measured amount of a chemical reagent, and when the air is passed through there the alcohol reacts within the reagent. Finally, the instrument has reached zero. After the operator has done this, if there is an alcohol reaction, there will be a proportionate lighting of the test ampoule color, and the galvanometer needle will be seen to be swung off to the side, with the switch, and that is due because of the greater light passing through because of the greater electricity generated by the photocell. To recenter the needle, to zero it, the operator then needs to move the light source towards the reference ampoule a proportionate amount. As he moves it toward the center, the needle swings back to the center, and simultaneously the attached pointer moves in the scale, and the pointer ends up at the reading of blood alcohol. Finally, the final mark should correspond to the blood alcohol level. In the photograph can be seen the valve for the take and analyze position of the cylinder-piston arrangement, the red light indicating 'empty,' and the green light indicating 'full.' The hose pulls out, bends back and forth, about six inches, and the control knob is linked to the light source and links the light source in a positive way to the two pointers. This is attached to a second-

ary linkage, and this moves along with the light source and the galvanometer and the needle; and this is the needle which indicates when the instrument is zeroed or re-zeroed. Q. Now, discussing the ampoule, what is inside the ampoule? A. The ampoule contains a measurement of a yellow standard chemical reagent; namely, 3 cc's of approximately .025 percent potassium dichromate, by weight in volume of 50 percent sulfuric acid in water, plus a smaller amount of a catalyst."

In the course of the cross-examination of Mr. Bassett the following testimony was given: "Q. . . . Does this mean that procedures could be established within the Department which would provide for the proper preservation of the test ampoule following the administration of the test? . . . THE WITNESS: Not necessarily, sir. It might or might not be possible. It may be. An insufficient number of tests in preserving these ampoules, as used by drinking suspects, has been done. Besides tobacco smoke, there could be other things blown in through the breath that ultimately would react, given enough time might ultimately react, although during the ninety seconds they do not appreciably react. . . . THE COURT: From one thing that you said previously, I drew the conclusion that any ultimate reaction of this kind would result in a higher and not a lower alcohol reading. THE WITNESS: Yes, your Honor. That is correct. THE COURT: So, any reaction of this type would be to the disadvantage of the defendant and not to the disadvantage of the People. THE WITNESS: Yes, sir."

Mr. Bassett further testified as follows: "Q. Do you know of any procedure, sir, which would accomplish the preservation of the ampoules in a condition approximating that of the time of the test? . . . THE WITNESS: No, sir. Again, there are two difficulties: the probability of organic compounds blowing in with the suspect's breath, and these other compounds slowly reacting, and over a period of time reacting enough to give an appreciable measurement or discoloration; and the other difficulty is that these glass bottles are not exactly matched. One may have slightly more or less optical density than the other. This is compensated within the unit by the initial zeroing and the final zeroing, but if the test ampoules are taken from the initial instrument and then to another instrument, the optical difference may be enough to result in an appreciably different reading. Q. You mean it would not be compensated by matching it with the other ampoule, by the zeroing of the machine? A. We would have no

initial zeroing. We would have to go with the final zeroing alone. Q. But that would not affect the contents itself? A. No, sir, not the contents itself.''

Mr. Bassett also testified that the breathalyzers are periodically checked for accuracy by using ''a standard alcohol-water equilibrator bottle by persons of the Alcoholic Unit.''

In *People* v. *Sudduth,* 65 Cal.2d 543, at page 546 [55 Cal. Rptr. 393, 421 P.2d 401], the Supreme Court took cognizance of the significance of the chemical test of breath: ''We note . . . that the blood alcohol test and the breath test for alcoholic absorption are alternate means for determining the percentage of alcohol in the blood. [In a footnote the court referred to *People* v. *Kovacik* (1954) 205 Misc. 275, 282-290 [128 N.Y.S.2d 492, 499-506], for a discussion of the development of, and scientific basis for, the breath-testing technique.] The value of such objective scientific data of intoxication to supplement the fallible observations by humans of behavior seemingly symptomatic of intoxication cannot be disputed. (*People* v. *Duroncelay* (1957) 48 Cal.2d 766, 772 [312 P.2d 690].) In a day when excessive loss of life and property is caused by inebriated drivers, an imperative need exists for a fair, efficient, and accurate system of detection, enforcement and, hence, prevention. (See *Breithaupt* v. *Abram* (1957) 352 U.S. 432, 439 [1 L.Ed.2d 448, 452, 77 S.Ct. 408].)''

█ It is, of course, obvious that specimens of urine and of blood must be preserved since the analysis thereof must occur at some time after the specimens have been collected. But in the use of the breathalyzer the ampoule has served its purpose upon the completion of the taking of the breath specimen, a procedure completed shortly after the arrest, and the Legislature has not seen fit to require that it be thereafter retained. The record shows that the breathalyzer can be accurately operated by a police officer who has been instructed in its use and that the possibility of error is not substantial when the officer exercises due care.[6] The superior court found that in disposing of the used ampoule the police officer acted in good faith and in accordance with the standard procedure of the police department. The petitioner made no request that it be

---

[6]If further experience in the use of the breathalyzer should demonstrate that the ampoule or any other item used in the giving of the test can and should be preserved for future analysis or inspection, appropriate statutory changes may be made by the Legislature. But in the absence of a showing of an abuse of due process there is no reason for this court to impose requirements which the Legislature, in the light of its own study of the matter, has not deemed to be necessary or appropriate.

retained or preserved. The evidence is devoid of any basis for a conclusion that the officer had any intention of suppressing evidence. (Cf. *Ogden* v. *United States* (9th Cir. 1963) 323 F.2d 818, 820.) While the discarded ampoule cannot be made available to the petitioner Covington, it is still possible to comply with subdivision (c) of section 13354 of the Vehicle Code which, as has been noted, is as follows: "Upon the request of the person tested full information concerning the test taken at the direction of the peace officer shall be made available to him or his attorney." There is no showing that the People have or will refuse to comply with such a request. There has been no denial of due process and the petition for a writ of prohibition was properly denied.

The judgment is affirmed.

Schweitzer, J., and Frampton, J. pro tem.,* concurred.

A petition for a rehearing was denied June 13, 1969, and appellant's petition for a hearing by the Supreme Court was denied July 23, 1969.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.