[Crim. No. 2159. Fifth Dist. June 30, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIE PETER ANDERSON, Defendant and Appellant.

**COUNCEL**

Allen R. Crown, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Eddie T. Keller and Joel Carey, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BROWN (G. A.), P. J.**—Upon appellant's pleas of not guilty and not guilty by reason of insanity to a charge of murder (Pen. Code, § 187), the trial judge, sitting without a jury, found him guilty of the lesser included offense of voluntary manslaughter and sane at the time of the commission of the offense. He was sentenced to state prison.

The offense occurred on January 26, 1971. The three-week trial at which he was convicted did not commence until June 3, 1974. The reason for the long delay was appellant's interim commitments to Atascadero State Hospital and to Patton State Hospital for treatment as a mental patient.

Though appellant did not expressly admit that he shot and killed the victim, the evidence was overwhelming that he had done so, his principal defenses being diminished capacity due to mental defect and the ingestion of drugs and alcohol and that he was not guilty by reason of insanity. It is apparent that the trial judge found appellant guilty of voluntary manslaughter rather than murder based upon the defense of diminished capacity. Six doctors (five psychiatrists and one psychologist) testified at the guilt phase of the trial; all of them concluded appellant suffered diminished capacity, but they did not agree upon the degree or extent of his impairment.

On the sanity phase, two of the psychiatrists concluded appellant was legally sane at the time of the offense, while three psychiatrists and one psychologist testified in substance that appellant was suffering from schizophrenia, paranoid type, that he had "dull normal" intelligence, and that he was incapable of harboring malice aforethought, of forming the requisite intent for murder or of appreciativg the nature and quality of his act or of distinguishing right from wrong. Accordingly, the latter four concluded that he was legally insane at the time of the commission of the offense.

While there is some conflict in the record regarding the details of the events which preceded and surrounded the killing, in sum the record shows that appellant spent the night of January 25, 1971, at the apartment of Lily Timmons (also known as Lily Maiden) on Brundage Lane in Bakersfield. It appears he had not had much, if any, sleep for a couple of days and had been ingesting alcohol and drugs. Shortly after 9 a.m. on the morning of January 26, 1971, Leroy Shiver gave appellant a

ride to a bank where he cashed a check and then returned to Lily Timmons' apartment. As they arrived, another car was leaving the apartment. "Buddy" Wilkins, the victim, was driving and Travis Williams was a passenger. Appellant wanted to talk to Williams so he got out of Shiver's car and walked to Wilkins' car and approached Williams. Wilkins became annoyed over the delay and engaged appellant in an argument during which Wilkins made a move as if reaching for a weapon under the seat. Appellant told Wilkins that "if he came up with anything he better use it." Both men made threats to each other. No weapons were found. Shiver left and appellant went into Lily's apartment.

Sometime later that morning a neighbor, Shirley Hines, came to Lily's apartment and appellant was introduced to her as Lily's new boyfriend. Wilkins came into the apartment, gave Lily some money to buy liquor, argued with Lily, and then left. Appellant was still there but no words were exchanged between him and Wilkins. Wilkins left. He said he didn't feel well and was going to take a nap.

A little later appellant went to Williams' apartment where he talked to Williams' wife, Seabelle, and told her he was "going to blow the mother-fucker's ass off" (referring to Wilkins).

Later, the same day, appellant along with Lily, Claudia Docks, JoAnne Jones and Vera Jones, went to Walter Sanders' place where appellant purchased a .12 gauge pump shotgun from Sanders which he had sold to Sanders a day or two before.

The group then went to Dale Wood's pool hall where they met Shiver and Willie Burton. Appellant, while there, told Shiver and Burton that he was going to beat up a guy who lived on Cottonwood Road and wanted Burton and Shiver to go with him. They left the pool hall in Burton's car and followed the women in the other car to Claudia Docks' house. About 30-40 minutes later Shiver, Burton, Vera Jones and Lily went to Lily's apartment in Burton's car along with appellant. On arrival all got out of the car and everyone, except appellant, started for Lily's apartment. Appellant went to Wilkins' apartment with his shotgun.

Appellant kicked in Wilkins' apartment door and said something like, "You think you can't die? I am going to blow your mother-fucking ass away." A shot was heard and a "thud, real hard against the floor." Appellant then jumped into Burton's car along with Burton and Shiver,

who drove. At least three persons witnessed and heard these events. Lily ran out of her apartment shouting, "he shot Buddy," and called the police.

As they drove away appellant admitted to Burton and Shiver that he "shot the guy." Burton took the gun and left it at his house. About 6 or 7 p.m. appellant was dropped off on King Street. He was located and arrested that evening.

Appellant, after being advised of his *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) rights, agreed to give a statement to the police, in which he admitted the shooting and took the position that he acted in self-defense.

At the police station that evening, after again being advised of his *Miranda* rights, appellant gave a statement to the police which was recorded. He stated that the shooting had been in self-defense; that on several occasions the victim had pulled a gun on him, including twice earlier the same day, once that morning in the driveway by the two cars and later the same morning at Lily's apartment; that he believed Wilkins was trying to "beaugard" his girlfriend, Lily; that he went over to Wilkins' apartment and pushed in the door; that as he did so, Wilkins "picked up his shotgun"; that the two men struggled, the gun went off, and Wilkins fell; that he (appellant) panicked and ran.

At the trial appellant, testifying in his own behalf, acknowledged a vague recollection of getting out of a car with a gun on the day in question and of going to someone's apartment and shooting him. At the same time he told of delusions he saw, such as people coming at him and threatening him. He told of a long drug history starting with glue sniffing even before he entered the military service, of taking a substantial number of "whites" every day, of his experience and injuries in the military service, of having been the victim of a shotgun and handgun shooting some months before the crime charged, and of his experience since the crime in Atascadero and Patton State Hospitals. He testified he was only somewhat friendly with Lily and denied knowing the victim, Wilkins, at all.

Appellant raises three claims of error which we shall consider seriatim.

### The Erroneous Commitment Under
### Penal Code Section 1026

The cause was first set for trial on April 19, 1971, which date was continued in order to have a present sanity hearing. On May 4, 1971, appellant was found not presently sane and committed to Atascadero State Hospital pursuant to Penal Code sections 1368 and 1370.[1] On March 28, 1971, the medical director of Atascadero State Hospital certified appellant as presently sane (see Pen. Code, § 1372) and he was returned to court for trial.

The cause was again set for trial on June 26, 1972; but on May 2, 1972, Judge John M. Nairn adjourned the proceedings for the purpose of further examination and hearing to determine whether or not appellant was presently sane. The order appointing two psychiatrists expressly stated the psychiatrists were "appointed to examine defendant and report whether or not defendant *is presently sane.*" (Italics added.) At this point, the first error occurred. The doctors each stated in the introductory paragraph of their respective reports that the examination and report was "in accordance with Section 1027 of the Penal Code."[2] The reports themselves, however, focus upon the question of appellant's present sanity only, and each concludes in the classic definition of present sanity (see fn. 1, *ante*) that appellant was *not presently sane.* Moreover, at the sanity hearing on May 11, 1972, Judge Nairn said, ". . . this is the time set for the hearing on the medical examiners' reports who heretofore made an examination provided for by Section 1027 [3] of the Penal Code, and that is to determine the *defendant's sanity at this time.*" (Italics added.) During the same colloquy defense counsel admitted that the psychiatrists determined the question of present sanity. In the court's order following that colloquy the court said, "It will be the order and judgment of this court, based upon reports of Dr. Samler and Dr. Badgley, that the defendant, Willie Peter Anderson, *is incompetent at this time,* and he is remanded to . . . custody. . . ." (Italics ours.)

---

[1]". . . A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder, he is unable to understand the nature of the proceedings taken against him and to assist counsel in the conduct of a defense in a rational manner." (Pen. Code, § 1367; *Tarantino* v. *Superior Court* (1975) 48 Cal.App.3d 465, 468 [122 Cal.Rptr. 61].)

[2]Insanity under Penal Code sections 1026 and 1027 deals with insanity at the time of the offense and is a different species of mental condition than present insanity. (See *People* v. *Wolff* (1964) 61 Cal.2d 795, 799-803 [40 Cal.Rptr. 271, 394 P.2d 959].)

[3]Apparently Judge Nairn was looking at the introductory paragraph to the doctors' reports.

Notwithstanding the above facts and the judicial determination of present sanity made by Judge Nairn, the forms which were used and the commitment itself indicated that the commitment was made pursuant to Penal Code sections 1026 and 1027. Thus the form minute order by way of the boxes which were checked indicated that the medical reports of the examining physicians, Doctors Samler and Badgley, had been for the purpose of determining appellant's sanity at the time of the offense and that the court found appellant insane at the time of the offense. Similarly, the two-page commitment order, which was also largely a preprinted form signed by the deputy clerk for Judge Nairn, set forth that the two doctors had been appointed "to examine said defendant on the plea of not guilty by reason of insanity, as provided for by Sec. 1027," that the "Court found the defendant was insane at the time the offense was committed," and that appellant was being committed to Patton State Hospital, "to be there confined until he has regained his sanity and then to be discharged according to law as provided for by Sec. 1026 and 1026(a) [sic] Penal Code."

Moreover, it cannot be disputed that pursuant to said documents appellant was kept and treated at Patton in the belief that he was there under a section 1026 commitment and that when he was returned by the hospital the letter dated January 29, 1974 (filed Feb. 7, 1974) applied to the court for appellant's release and a hearing in accordance with the provisions of section 1026a. It is also clear that following appellant's treatment at Patton State Hospital the superior court's "Order for Return of Prisoner," filed February 14, 1974, and bearing the name of Judge J. Kelly Steele, was pursuant to section 1026a.

However, it is also clear that no determination of guilt or innocence was made prior to the trial which was set for and commenced on June 3, 1974, after appellant was returned from Patton State Hospital on February 7, 1974. Appellant did not receive a Penal Code section 1026a hearing.

After the trial[4] Judge Nairn called counsel and the court's attention to the erroneous commitment papers dated May 11, 1972. After a hearing on the matter, Judge Jelletich on October 9, 1974, entered an order that the reference to section 1026 in the May 11, 1972, commitment had been a clerical error and corrected the entry to read section 1368.

---

[4]The trial was before Judge John D. Jelletich.

Appellant argues that his commitment on May 11, 1972, was a Penal Code sections 1026-1027 commitment, that upon his return from Patton State Hospital he was deprived of a Penal Code section 1026a hearing, and that his subsequent trial on guilt and sanity in 1974 violated his right against double jeopardy.

Upon analysis, however, we have concluded that the correction of the order as being a clerical error was correct and there was no error. ■ It is established that independent of a statute a trial judge has power to correct mistakes and to annul orders and judgments which were inadvertently or improvidently made, and that he has the power to vacate judgments and orders inadvertently made which are not actually a result of the exercise of judgment. The distinction between a clerical error and a judicial error does not depend so much on the person making it as it does on whether it was the deliberate result of judicial reasoning and determination. (*Gill* v. *Epstein* (1965) 62 Cal.2d 611, 614-615 [44 Cal.Rptr. 45, 401 P.2d 397]; *People* ex rel. *Dept. of Water Resources* v. *Gianni* (1972) 29 Cal.App.3d 151, 156-157 [105 Cal.Rptr. 248].) "The distinction between clerical error and judicial error is 'whether the error was made in rendering the judgment, or in recording the judgment rendered.' " (*In re Candelario* (1970) 3 Cal.3d 702, 705 [91 Cal.Rptr. 497, 477 P.2d 729]; see *In re Daoud* (1976) 16 Cal.3d 879, 882 [129 Cal.Rptr. 673, 549 P.2d 145].)

■ Applying the foregoing rules to the facts in the instant case, it is apparent that since there was in fact and in law not a Penal Code section 1026 commitment on May 11, 1972, and the court's judicial determination was one of present insanity only, the trial court's action in correcting the record to conform with the actual judicial determination that had been made was correct. Accordingly, appellant's contention must fail.

#### The Unavailability of Tape Recordings

During the investigation the prosecutor and the police made 12 recordings of conversations. These included statements by appellant to the police, statements of witnesses Leroy Shiver, Willie Burton, Shirley Hines, Travis Williams and Jimmie Johnson and conversations between appellant and his visitors which took place while appellant was in jail. On May 9, 1973, the tapes were intentionally erased by the district attorney's office.

No transcriptions of the tapes were made, though there were summaries of some of them that had been made by the investigators and police.

The public defender was aware of the existence of some tape recordings, reference to them having been made in some police reports. Accordingly, that office procured discovery orders before the first trial date, on February 19, 1971, before the second trial date on April 4, 1972, and finally before the third trial date on April 30, 1974.

On May 14, 1974, appellant filed a pretrial motion to dismiss the case based upon the destruction of the tape recordings and the failure of the district attorney to comply with the discovery orders. The motion was denied. At the hearing on that motion the public defender offered two affidavits from Doctors Samler and Matychowiak, who had been appointed to examine the defendant on the not guilty by reason of insanity issue. The purpose of these affidavits was to indicate that listening to appellant's statements would be valuable "in arriving at a conclusion either confirming or evaluating or re-evaluating their diagnosis and their opinion." It further appears that Doctors Matychowiak and Perelli-Minetti, who are the two doctors who testified at the sanity trial that appellant was not insane at the time of the commission of the offense, had listened to some of the recordings of appellant's statements and conversations in 1971, though it does appear that at the time these doctors' examinations were primarily on the issue of present sanity.

We must agree with appellant that the tapes were important for effective and vigorous cross-examination of the witnesses involved, particularly in connection with the preparation of his defenses of diminished capacity and insanity at the time of the offense and that they were material evidence upon the issue of guilt or innocence.

During the trial appellant made related motions to exclude the testimony of each witness whose interview with the police had been tape recorded, the testimony of the two doctors who had listened to some of these tape recordings during their psychiatric evaluations of appellant in 1971, and the testimony of an investigator concerning appellant's statement to the police. All of these motions were denied.

Finally, the issue was raised on appellant's motion for a new trial which was denied.

Turning to the law, it is conceded that had the tapes not been erased the prosecutor would have been required to make them available to the appellant. (*Cash* v. *Superior Court* (1959) 53 Cal.2d 72, 75-76 [346 P.2d 407]; *Vance* v. *Superior Court* (1958) 51 Cal.2d 92 [330 P.2d

773].)  ▮  Both parties agree that the intentional or negligent suppression by the prosecution of substantial material evidence favorable to the accused denies defendant a fair trial and requires reversal. (*People* v. *Ruthford* (1975) 14 Cal.3d 399, 406 [121 Cal.Rptr. 261, 534 P.2d 1341]; *In re Ferguson* (1971) 5 Cal.3d 525, 532 [96 Cal.Rptr. 594, 487 P.2d 1234].)

However, as is emphasized in *People* v. *Hitch* (1974) 12 Cal.3d 641, 647 [117 Cal.Rptr. 9, 527 P.2d 361], unlike the above referred to cases, the tape recordings have been destroyed, the contents thereof are not before us, and it cannot be determined with certainty if the contents would have been favorable to the appellant. Under such circumstances, the *Hitch* case, by analogy to the disclosure of the identity of an anonymous informant, establishes the concept that appellant's burden to establish that the evidence would be favorable is satisfied if there is a reasonable possibility that the missing evidence would constitute favorable evidence on the issue of guilt or innocence. (*People* v. *Hitch, supra,* 12 Cal.3d at pp. 648-649.) It is apparent from what has been said, including the affidavits of the two doctors, that the appellant here has satisfied that burden.

As pointed out in *Hitch,* when the issue before the court involves lost or destroyed evidence, the duty of disclosure is operative as a duty of preservation, and ". . . the imposition and mode of sanctions depend upon the particular circumstances attending such loss . . . ." (*People* v. *Hitch, supra,* 12 Cal.3d at p. 650; see also *United States* v. *Augenblick* (1969) 393 U.S. 348 [21 L.Ed.2d 537, 89 S.Ct. 528]; *United States* v. *Bryant* (1971) 439 F.2d 642 [142 App.D.C. 132]; *Covington* v. *Municipal Court* (1969) 273 Cal.App.2d 470 [78 Cal.Rptr. 563] (overruled in part by *People* v. *Hitch, supra*).)

While *Hitch* established a stringent rule for the preservation of evidence, it expressly made that rule prospective in operation. *Hitch* was filed on October 21, 1974. All of the events herein, including the trial, took place prior to that date. *Hitch* further articulated the rule applicable to cases prior to the date it was filed as being that intentional but nonmalicious destruction or loss of evidence by law enforcement agencies will not result in sanctions if the destruction was accomplished in good faith and in conformity with standard law enforcement procedures. (*People* v. *Hitch, supra,* 12 Cal.3d at p. 655; *United States* v. *Augenblick, supra,* 393 U.S. 348; *Covington* v. *Municipal Court, supra,* 273 Cal.App.2d 470; *People* v. *Chapman* (1975) 47 Cal.App.3d 597 [121 Cal.Rptr. 315].) To make that determination it is obviously necessary to examine the record.

We therefore turn to such an examination regarding the circumstances surrounding the erasure of the tapes in the instant case. At the hearing on the motion to dismiss, testimony was taken from Wayne Frank, an investigator for the prosecution, Nancy McAllister, the stenographic reporter who actually erased the tapes, and John Thomas, the deputy public defender who was assigned to defend the cause in 1971. None of these persons had any personal recollection of the circumstances surrounding the keeping and erasure of these particular tapes but relied upon the records.

According to the standard procedure and practice followed in the district attorney's office, tapes were kept in a tape locker and McAllister made a separate index card for each tape. All transactions regarding the tapes were intended to be recorded on the index cards, including the making of copies, the incidents of taking tapes out of the locker and returning them, and information regarding the erasure thereof. With the exception of the jail tape recordings (which the discovery order of Feb. 19, 1971, did not cover) there is a notation on the relevant index cards on April 14, 1971, that copies of the tapes were made by District Attorney's Investigator Joe Johnson and given to District Attorney's Investigator Wayne Frank for the public defender. It appears that on some occasions the public defender picked up copies of tapes and on other occasions they were hand delivered to the public defender. McAllister testified that the fact that the notation indicated that copies were given to Frank and there is no notation on the cards that they were returned to the file would normally result in a conclusion that the tapes did not get back into the file. However, admittedly on occasion tapes were taken from and returned to the file by some personnel of the district attorney's office without making a notation on the cards, in violation of the rules.

There was also a notation on each index card in McAllister's handwriting, initialed by District Attorney's Investigator Dodd, indicating that McAllister erased the tapes on May 9, 1973, pursuant to the direction of Dodd. She testified that every year an investigator would routinely review the tape list and give her directions as to which tapes to erase. As indicated, Dodd did not testify, so the record is silent as to the reason he directed McAllister to erase the tapes.[5]

Frank had no independent recollection as to what happened to the tapes after they were delivered to him.

---

[5]We, of course, cannot speculate that because the commitment papers of appellant on May 11, 1972, indicated that his commitment was under Penal Code section 1026, Dodd concluded that the tapes would no longer be needed.

Mr. Thomas, the deputy public defender who handled the case in 1971, testified that he had no recollection of having seen the tapes, that he could remember nothing specific about the tapes in this case, and that he normally did not have any trouble with the district attorney in obtaining tape recordings pursuant to a discovery order. He further indicated that he made a cursory search of the public defender's office for the tapes and they were not found. There was no testimony as to any regular office routine for indexing and keeping tapes in the public defender's office.

■ The court made no finding on whether the preservation and erasure of the tapes was or was not accomplished in good faith and in conformity with standard law enforcement procedures. The information in the record which we have summarized above is inadequate to determine as a matter of law whether the pre-*Hitch* standard above articulated was complied with by the district attorney. We point in particular to the lack of the testimony from Investigator Dodd who actually ordered the tapes erased. Accordingly, we have determined that the cause must be returned to the trial court for a post-judgment evidentiary hearing to make that determination. (See *People* v. *Simpson* (1973) 30 Cal.App.3d 177, 185-186 [106 Cal.Rptr. 254]; *People* v. *MacDonald* (1972) 27 Cal.App.3d 508, 511 [103 Cal.Rptr. 726].)

### INEFFECTIVE REPRESENTATION OF COUNSEL

Appellant asserts that he had ineffective legal representation because the public defender's office had on a prior occasion represented witness Lily Timmons on a bad check charge. At the time of the trial Lily Timmons was on probation on that charge. Trial counsel made a pretrial motion to be relieved from representation of appellant on this ground. The motion was denied.

It was argued that while there was no demonstrable actual conflict, there was a theoretical conflict because of the possibility that information obtained from the witness in confidence might have to be used to impeach her and because defense counsel might be reluctant to vigorously cross-examine the witness because of the prior representation.

First, it is noted that the public defender's representation of appellant herein started some two years before he was appointed to represent the witness. Further, it is not shown that the same individual in the public defender's office represented both persons.

■ It is well established, of course, that the defendant bears the burden of establishing counsel's ineffectiveness, that proof of the inadequacy or ineffectiveness must be a demonstrable reality as opposed to mere speculation, and that said inadequacy must have resulted in the withdrawal of a crucial defense so as to reduce the trial to a "farce or a sham." (*People* v. *Jenkins* (1975) 13 Cal.3d 749, 753 [119 Cal.Rptr. 705, 532 P.2d 857]; *People* v. *Cook* (1975) 13 Cal.3d 663, 670-673 [119 Cal.Rptr. 500, 532 P.2d 148].)

■ In the case at bench, appellant utterly failed to show a conflict as a demonstrable reality, that he was deprived of a meaningful defense or that the prior representation in any way affected the quality or vigor of counsel's representation of appellant in this cause. (*People* v. *Cook, supra,* 13 Cal.3d at pp. 670-673.) No representation or offer of proof was ever made to indicate the public defender's office had learned anything by virtue of having represented the witness earlier which it otherwise would use to impeach her in the instant case. Mr. Baca, the deputy public defender who represented appellant, indicated he knew of no such information, that he was "perfectly willing to go ahead and defend Mr. Anderson," and thought it was more a matter of ethics. The witness was in fact called by the defense and was in fact impeached by appellant's counsel by use of a statement the witness gave at an earlier hearing. In view of the overwhelming evidence of guilt, the witness' testimony added little to the case.

The cause is remanded to the superior court with directions to hold a post-judgment evidentiary hearing limited to the issue of whether the procedures for preservation and erasure of the recordings conformed with standard law enforcement procedures and whether the destruction of the tape recordings was intentional but nonmalicious and done in good faith and in conformity with standard law enforcement procedures. Should the trial court conclude that the standard for the preservation and destruction of tape recordings was not met, then it should further order that the judgment be vacated and the cause set for a new trial, at which trial there should be excluded from evidence the testimony of all witnesses (except the appellant) who gave pretrial tape-recorded testimony and the testimony of all witnesses who heard and relied upon the testimony in the destroyed tape recordings. If the court should find that the standard for the preservation and destruction of tape recordings has been met, such judgment should be accompanied by a further order that the judgment of conviction is to stand and the vacation of the judgment is denied so that the appellant may seek a review of the ruling

made upon the post-judgment evidentiary hearing. (See *People* v. *Simpson, supra,* 30 Cal.App.3d 177; *People* v. *MacDonald, supra,* 27 Cal.App.3d 508.)

The judgment of conviction is ordered to stand, but the case is remanded to the superior court for further proceedings consistent with the views set forth in the foregoing opinion.

Gargano, J., and Keane, J.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.