Filed 2/10/22  P. v. Smoot CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>TRAVIS SMOOT,<br><br>     Defendant and Appellant. | F079396<br><br>(Super. Ct. No. BF164146A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John D. Oglesby, Judge.

Benjamin Owens, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Angelo S. Edralin, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Travis Smoot was convicted by jury trial of second degree murder. On appeal, he raises various contentions related to his inability to plead not guilty by reason of insanity (NGI). He also contends his one-year prior prison term enhancement must be stricken due to passage of Senate Bill No. 136. We strike the prior prison term enhancement, remand for resentencing, and affirm in all other respects.

## PROCEDURAL SUMMARY

On May 12, 2016, the Kern County District Attorney filed a complaint against defendant alleging, among other things, the commission of first degree murder. (Pen. Code, § 187, subd. (a).)[1] Defendant pled not guilty.

On October 13, 2016, on defense counsel's motion, the trial court suspended criminal proceedings and ordered the examination of defendant to determine his competence to stand trial (§§ 1367, 1368). Two psychologists examined defendant and filed written reports containing their recommendations. On December 6, 2016, the court found defendant competent to stand trial and reinstated criminal proceedings.

On December 21, 2016, following a preliminary hearing, the district attorney charged defendant, by information, with one count of first degree murder (§ 187, subd. (a), count 1). The information further alleged defendant had suffered a prior "strike" conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and had served a prior prison term (§ 667.5, subd. (b)).

On January 4, 2017, defendant pled not guilty to count 1 and denied all special allegations.

On October 9, 2018, defendant moved under *Marsden*[2] for the appointment of substitute counsel because defense counsel would not allow him to plead NGI. The trial

---

[1]    All statutory references are to the Penal Code unless otherwise noted.

[2]    *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

2.

court denied the motion and ruled the decision whether to enter the plea was tactical and committed to the discretion of defense counsel.

On October 24, 2018, defense counsel again moved to suspend proceedings to determine defendant's competence to stand trial (§ 1368). The trial court granted the motion, suspended criminal proceedings, and appointed a psychologist to again examine defendant (§§ 1367, 1368). Upon defense counsel's objection to the psychologist's written report, a second psychologist was appointed to examine defendant. The second psychologist filed her report with the court. On January 14, 2019, the court, having considered the reports of the two psychologists, again found defendant competent to stand trial and reinstated criminal proceedings.

On March 13, 2019, trial commenced. On March 25, 2019, a jury found defendant not guilty of first degree murder and guilty of the lesser included offense of second degree murder.

In a bifurcated proceeding, the trial court found the prior strike conviction allegation not true and the prior prison term allegation true. On May 14, 2019, the court sentenced defendant to 15 years to life on the second degree murder conviction and an additional one year for the prior prison term enhancement.

On June 3, 2019, defendant timely filed a notice of appeal.

## FACTS

On December 1, 2015, defendant, an inmate of Kern Valley State Prison, killed his cellmate, Larry Thomas Hite, in the early hours of the morning. Later that morning, Correctional Officer Joseph Harmon was conducting a security check and saw defendant standing in his cell. Officer Harmon greeted defendant and defendant told Officer Harmon he had killed Hite.

Officer Harmon was unable to see Hite because a curtain had been draped to obscure the back portion of the cell. Defendant refused to remove the curtain. Officer Harmon secured defendant's hands through the food cuff port of the cell and sounded an

3.

alarm to summon other officers for assistance. The cell door was opened, and another correctional officer, Officer Ray Adair, took defendant into custody. Officer Adair escorted defendant to the rotunda area of the prison and recalled defendant saying, "That's what he gets. That's what he gets."

Officer Harmon and Correctional Sergeant Mark Hildebrand entered the cell and discovered Hite's body. He was lying on his stomach and his face, neck, and chest area were in a pool of blood. His hands and feet were tied behind him. A pen was lodged in one ear and a pencil in the other. His eyes were gouged out and a cane was inserted in his rectum. Envelopes were on his back and the words "case closed" were written on one of them. The words "karma," "bitch," "woman killer," and "rapist" were written in blood on his shirt.

Officer Adair and Sergeant Hildebrand then escorted defendant to another building. During the transport, defendant said he and Hite had been drinking coffee all night and Hite was talking about a rape he had gotten away with. Defendant said he told Hite to stop discussing the rape or he would kill him. Defendant admitted that, when Hite did not stop, defendant tortured him all night before killing him at approximately 4:00 a.m. that morning.

Two audio recordings of interviews conducted with defendant were entered into evidence and played for the jury: one conducted by correctional officers on the day of the murder, and another conducted by a deputy district attorney and district attorney investigator several months later. Transcripts were made available at trial and are part of the clerk's transcript on appeal. The transcripts reveal the following:

Defendant received *Miranda*[3] warnings before each interview and agreed to speak. He recounted much of what was set forth above. He related drinking coffee in the early morning hours but denied using any drugs or alcohol. He confirmed, among other things,

---

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436.

4.

torturing Hite by strangling him with a sheet—pulling the sheet with his hands while pushing down on Hite's neck with his foot, allowing him to catch his breath, and then strangling him again. He recounted poking both of Hite's eyes out with a pen. Using the palm of his hand, he repeatedly pounded a pen into Hite's ear and stuck a pencil in his other ear. He also described other aspects of the assault.

During the interviews, defendant repeatedly expressed his aversion to the rapes and murders Hite allegedly confessed to. He told Hite, "Shut the fuck up or I'm gonna kill you." He warned Hite again, "[D]on't make me fuckin' have to kill you, dude." He warned Hite that he would "flip the fuck out" if Hite continued to talk about raping women.

In the interviews, defendant confirmed that no one told him to kill Hite and that he "knew better." Defendant said he did not regret the murder because Hite was a "little wild, moralless animal" with "no values." He called Hite a "disgrace" and told the interviewers, "[I]f you don't grow any values mentally … with your people then who are you?" He viewed the murder of Hite like a veterinarian putting a wild animal down and said, "And that's how I felt. If I woulda—if I woulda felt that he was a human being in my cell, then I would have treated him like one. You know?" He continued, "I can only go so far before I snap and just flip out.… And that's what happened. He was tal—he was running his mouth so bad. Like I'm running my mouth now, but—and I'm running it in a good way, but he was just—just talking and talking and talking about all the bad shit just going against all my moral values—everything I've—I've tried to stand for he was breaking down my mentality."

Defendant explained that "[h]e just wasn't of my flock … of my pack. You know? And, um I'm not with all that shit. You know?" Defendant said, "I wanna have a state of mind and I wanna—I wanna be okay with myself. I wanna fall asleep and—and to wake up in the morning and say I'm a good kid. You know? My mom raised a good kid. My dad was in prison, you know? But my mom did her part. She raised a good

5.

youngster and, uh, I'm all right.  But if I just stay there in that fuckin' just … just disgusting bullshit and I'm a part of it.  You know?  You know, guilty by a proxy—guilty [by] association.  You throw yourself in with the monkeys and you become a monkey.  You know?  And I—I just had to get out of that—that cell.…  I know too much to where I'm not gonna contaminate my life with shit like that.  And I just had—I've harvested so much hate in my heart that it showed when I killed him."

Defendant was also asked the following questions during one of his interviews and gave the following answers:

"Q1:  (Unintelligible) you got any rage issues, [defendant]?

"A:  Oh yeah.

"Q1:  Do ya?

"A:  I do, but I steer it towards good things now.

"Q1:  So you're telling me you have rage issues, but you can control it?

"A:  Oh yeah, I'm gonna, um, I'm gonna think ….  I'm not a wild animal.  You know?  Think about shit.  (Unintelligible).  I think about stuff.  I think about—I think about things before I act.  I knew what I was doing.

"Q1:  You knew what you were doing?

"A:  Oh hell yeah.

"Q1:  There's no question about that.

"A:  No—no.

"Q1:  No one can ever accuse you of not being in control of yourself that you didn't know what you were doin'?

"A:  Nope.  Nope, and I know it's, like, a, uh, and that's gonna be my downfall if I wanna have any way out of this, but you know what?  It's gonna be the DA—the DA's gonna put me away for my life and, um, I'm gonna keep my honor and life goes on."

As defendant related repeatedly choking Hite with a sheet, his interviewer commented, "[Because] at that point you could [have] decided hey to just leave him alone." Defendant responded, "Oh yeah I could of." Defendant stated, "I could [have]—[Hite] could [have] got out cheap but there's—fuck that no ya know an eye for an eye." In another of his interviews, defendant likened his behavior to the Old West, when horse thieves and other criminals were lynched before the sheriff even arrived.

Defendant also mentioned Hite had a bible and said, "I hate seeing that shit. A—a murder fucking rapist dude come into prison and try to claim God and shit. Ya know when he's fuckin' goin' to hell." When asked if he viewed Hite as a hypocrite, he responded, "Oh yeah he ain't got no clean time."

### *Defense Evidence*

<u>Defendant</u>

Defendant testified he had been moved to Kern Valley State Prison on November 29, 2015, from the Special Housing Unit (SHU) at Corcoran State Prison where he had been in solitary confinement.

Defendant was paranoid about being placed in a new environment which he viewed as "hostile." He noted he had "mental issues from isolation but not as severe as being put in—right into harm[']s way to a predator like that"—referring to Hite. While in isolation at Corcoran State Prison, defendant would hallucinate, talk to himself, and imagine others being present. He admitted having had prior mental problems and stated he was put on medication for depression and other mental issues. He said he was housed in a separate area of the SHU dedicated to persons with similar backgrounds. He said he did not experience hallucinations outside of the SHU.

Defendant testified he and Hite had been in the same cell for only three days. According to defendant, the two inmates in the neighboring cell were in a sexual relationship and Hite was friends with those inmates. Defendant testified Hite wanted to establish a sexual relationship with him, Hite bullied and tried to fondle him, and he

rebuffed Hite's advances. He testified Hite would try to corner him in the back of the cell and would call him belittling names. Defendant warned Hite that, if that behavior continued, defendant would get violent and would "flip out on [Hite] until [he, defendant] didn't know what [he] was doing." Hite said he was not afraid of defendant and he had raped and killed before.

Defendant testified this type of behavior continued during their time together in the cell and the tension between them escalated. Defendant claimed Hite was "messing with [his] mental stability, [his] mental state" and was "[t]rying to like break [him] in to be like his little … like his fish or something …." Defendant told Hite he was not gay and was not interested in a sexual relationship.

Defendant said Hite was hostile from the start. For example, when defendant tried to show Hite his paperwork describing his offenses, Hite tried to slap it out of his hands and said, "I don't care about paperwork. I rape motherfuckers. I kill—I kill bitches." At another time, Hite called defendant a "little punk" and said, "I've killed better. I've killed worse. You ain't nothing to me." Hite said he would rape and stab defendant, he had done it before to others, and he had killed and buried multiple people.

Defendant further testified that, on the day of the murder, Hite started relating past murders and rapes he had committed. He told defendant he would do the same to him and would "poke [him] full of holes with a knife." Hite said "he'[d] killed before like that."[4]

According to defendant, a fight ensued when Hite began threatening to rape defendant and began hitting defendant with his cane. Defendant tried to elbow him back and was yelling, "I'll flip out on you back, dude. I'll flip out on you back." The fight continued. Defendant testified he only remembered the beginning of the fight and not the

---

**4** At the conclusion of defendant's case-in-chief, the parties agreed to the following stipulation: "It is stipulated between the parties that [Hite] suffered a conviction for first degree murder on September 11th, 2015. The victim of the murder was a woman."

end, stating, "I came to. I know I came to. I don't really remember much of it." He remembered having his hands on Hite's neck, trying to bang Hite's head in, and knocking Hite unconscious. He also recalled stabbing Hite in the eye with a pencil.

On cross-examination, defendant was shown pictures of Hite bound on the floor of the cell. Defendant admitted, "I tied his hands behind—I put his hands behind his back and his feet behind his back. I tied his feet and his hands." Defendant recognized the binding around Hite's neck, as well, and admitted he was responsible for tying all the bindings together in a "hogtie fashion." Defendant admitted impaling Hite with a pen, pencil, and cane and writing on Hite's clothing. At other times in his testimony, defendant denied remembering some of the above details.

Defendant said he was in fear of "being killed or strangled or being raped" by Hite. He said Hite threatened to rape him and tried to rape him. The prosecutor played an audio clip of defendant's interview with the deputy district attorney and district attorney investigator in which defendant denied any "sex play" between himself and Hite prior to the murder. In the tape, defendant said, "I thought about saying that, you know what I'm saying? But no, there wasn't." At trial, defendant claimed he had lied to his interviewers when he denied any sexual physicality between him and Hite and stated, "[H]e came at me with the cane to rape me."

Dr. Kupers

Dr. Terry Kupers, a medical doctor with a master's degree in social psychiatry, testified he had studied inmates within penal institutions since the early 1970's. According to Dr. Kupers, beginning in the late 1970's and into the 1980's, prisons began to use solitary confinement with more frequency. Dr. Kupers was often asked to testify in connection with class action lawsuits about the "psychiatric harm of long-term solitary confinement." As a result, he developed expertise in the area.

Dr. Kupers testified that a "relatively stable person without any preexisting mental disorder of any kind," when placed in solitary confinement will experience near-

9.

immediate anxiety often resulting in panic attacks. Such inmates often have trouble with breathing, concentration, and memory. They might develop the sense that they will never get out and that they are going to die.

Dr. Kupers said, "There's a stunning amount of anger that develops and it's beyond the rational what you would think the anger about being put in an isolation cell. It's even greater and it mounts over time." Inmates in isolation will often suppress the anger because they know their release from solitary confinement is contingent on their good behavior. He likened the situation to PTSD[5] in returning war veterans and stated the pent-up anger can manifest itself in an inappropriate degree when the inmate really gets angered.

Dr. Kupers said solitary confinement inmates often exhibit compulsive behaviors—pacing, excessive cleaning. They develop thinking disorders and distorted thinking. They "see the walls closing in on them. They report hallucinations. They see things in the wall. They look at the cinderblock walls and start seeing faces and they become paranoid. Paranoia is a very big problem .…"

Paranoia, anger, and anxiety are experienced simultaneously and operate to accelerate each other. This impairs the inmate's judgment and can lead the inmate to perceive a greater risk than might be presented by a given situation. Dr. Kupers testified, "The tendency [of an inmate] to act with aggression is greater and the ability to discriminate when that aggression is just or not just is lost."

Dr. Kupers said there is a "dominance hierarchy in prisons" that requires prisoners to "establish themselves as a tough person and able to handle themselves in prison. To have any kind of reflection otherwise is extremely dangerous and you can be sexually assaulted, raped, and killed." Any sort of sexual comment, advance, or provocation requires a prisoner to fight lest they be stigmatized and victimized.

---

[5]     Posttraumatic stress disorder.

10.

## DISCUSSION

### I. NGI Issues

Defendant contends the trial court deprived him of his statutory right to enter a plea of NGI. He further contends he was denied his Sixth and Fourteenth Amendment rights to effective assistance of counsel because defense counsel would not allow him to plead NGI, and the trial court erred by denying his *Marsden* motion to obtain substitute counsel on that ground.

We have reviewed the record and determine that any errors in the trial court's failure to allow defendant to plead NGI, defense counsel's refusal to allow defendant to plead NGI, and the trial court's denial of defendant's *Marsden* motion for new counsel were harmless.

### A. Background

At the *Marsden* hearing, defendant gave the trial court the following reason for wanting new counsel:

> "I would rather go state appointed and I'd like to try to waive more time on my case. And to certain factors we don't see eye to eye with, I'd like to go a certain route. I wanted to put an insanity plea in because the person that I was celled up with, he had put me through mental duress and a certain mental state that I went through before I reacted badly towards this—he was a rapist and he killed a woman and buried her in the woods and he was threatening me and trying to rape me and it had a negative reaction on my side and so I was trying to put a different plea in and I want to waive more time to work on my case ...."

Defendant stated he wanted "[t]o start new, ... start fresh."

The trial court expressly asked defendant if he wished to enter an "insanity plea" in order to present information of his mental state to the jury. Defendant responded:

> "Yes. And [defense counsel], Ms. Lee, wanted to go imperfect self-defense and it wasn't. It was—they had a—there was a mental aspect, me in reaction towards this person, me being celled with him and the cell was capped to where I couldn't get out of the cell. When he started showing

11.

himself, predatorial behavior, and it had an [e]ffect on my mental state. There's a mental aspect there that had nothing to do with self-defense."

The trial court asked defense counsel if she had any response, to which she replied:

> "I'll just note I've secured an expert. His name is Terry Kupers, … who I believe has an MD, but is more a psychiatrist or psychologist.… [Defendant] was in the Corcoran SHU for about 16 months leading up to being single celled with [Hite]. [Hite] was his first cellmate after a long period in the SHU. Dr. Kupers does quite a bit of research on how the SHU affects people's mental state. He worked on the Pelican Bay class action lawsuit and has done many other cases dealing with inmates who come out of the SHU and the kind of symptoms they have and the behaviors that they have. We discussed previously that I don't think it fits into an NGI defense .… [¶] … [¶] [B]ut I think the mental state of coming out of SHU can either make for an imperfect self-defense or we can also talk about—I mean, in terms of mental health issues or mental state issues, we've already talked about self-defense in general. But if the jury doesn't believe a pure self-defense, the SHU information can help make it an imperfect self-defense or if the Court would allow a heat of passion manslaughter. So I've worked on that mental state information with an expert in how it's going to play into potential defenses. The last time we talked about going NGI was weeks or months ago and I don't think the information we have from the expert legally fits into an NGI defense because of the certain constraints of the law with that. So we have discussed that at length.
>
> "The issue this morning is that [defendant] would like more time before trial. I didn't announce ready this morning. I received some new information on Friday on discs that, I need to make sure I've gone through everything. So once I've reviewed that I otherwise am ready and I'm ready to discuss the mental state issues going on at the time of the incident."

The trial court said it would give defendant the last word. Defendant stated:

> "I just need more time. I don't see eye to eye on certain aspects, you know, respectfully, for background. I just—I know what happened, you know. I know [Hite is] not the victim. He came at me first. He provoked me sexually and physically and was messing with my mental state .…"

Defendant disagreed with defense counsel that his SHU confinement was relevant to his defense. Defendant was adamant the problem was he was put in a cell with a sexual predator who "portrayed predatorial sexuality aspects towards [defendant] and

12.

mess[ed] with [his] mental state." He stated, "[Hite] came at me and he ended up dead on the ground. I had a negative reaction towards it." Defendant continued to assert the SHU had no relevance to his case and concluded by saying, "I'm the victim."

The trial court advised defendant that the issues he raised as to his mental state could be raised at trial without the need to enter an NGI plea. In its concluding remarks, the court stated, "To the extent there are disagreements about trial strategies or tactics, the ultimate decision in determining the appropriate strategy or tactic rests solely with the attorney .…" The court denied defendant's *Marsden* motion.

B.      Analysis

1.      Failure to Allow NGI Plea

The decision of whether to enter a plea of NGI "is a matter within the defendant's, rather than counsel's, ultimate control." (*People v. Clark* (2011) 52 Cal.4th 856, 893.) "[A] defendant has the right to personally enter the plea of his choice regardless of what his counsel thinks of the merits of an NGI plea." (*People v. Henning* (2009) 178 Cal.App.4th 388, 394 (*Henning*).) However, the erroneous denial of a defendant's right to enter his desired plea warrants reversal only if the defendant was prejudiced by the error. (*Cassim v. Allstate Ins. Co*. (2004) 33 Cal.4th 780, 800, citing Cal. Const., art. VI, § 13.) As we discuss below, assuming the trial court erred by failing to allow defendant to plead NGI, we conclude defendant was not prejudiced by that error.

A defendant's right to "personally enter the plea of his choice" is a statutory right under section 1018. (*Henning*, *supra*, 178 Cal.App.4th at pp. 397–398.) Generally, when determining whether a defendant has been prejudiced by an error of state statutory law, we ask whether it " 'is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*); *Henning*, at p. 398.) In this context, reasonable probability " 'does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.' " (*Cassim v. Allstate Ins. Co*., *supra*, 33 Cal.4th at p. 800.)

13.

Before engaging in the harmless error analysis set forth in *Watson*, however, we must first determine whether federal constitutional violations are also at issue. If a federal constitutional violation is implicated, we apply a more stringent harmless error analysis. (*Chapman v. California* (1967) 386 U.S. 18, 23–24 (*Chapman*).) "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Id*. at p. 24.)

In *Henning*, as in our case, the defendant contended he was prejudiced by the trial court's failure to allow him to plead NGI. (*Henning*, *supra*, 178 Cal.App.4th at p. 394.) In determining whether the *Watson* or *Chapman* harmless error analyses applied, the *Henning* court held that no federal due process violation occurs under such circumstances where the defendant "receive[s] full consideration of the facts regarding his desired insanity defense." (*Henning*, at pp. 398–399, citing *Pennywell v. Rushen* (9th Cir. 1983) 705 F.2d 355, 357–358.)

Here, defendant received full consideration of the facts regarding his NGI defense. At trial, he put forth all the evidence he contended at the *Marsden* hearing and all the evidence he contends on appeal were relevant to the defense. Among other things, he testified he suffered hallucinations while in the SHU but denied suffering hallucinations outside of the SHU. He testified to his prior mental problems and stated that Hite was "messing with [his] mental stability." He testified to the events leading up to the murder and to the effect Hite's alleged confessions had on his mental state. In addition, defense counsel put forth the testimony of Dr. Kupers, who confirmed the effect the SHU can have on inmates and their mental processes.

Because defendant obtained a full consideration of the facts underlying his desired NGI defense, his claim does not rise to a federal constitutional level and "is therefore subject to *Watson* harmless error analysis." (*Henning*, *supra*, 178 Cal.App.4th at p. 398.) In such situations, "a trial court's failure to allow a defendant to plead NGI is harmless when the record affirmatively shows the insanity defense lacks evidentiary support." (*Id*.

14.

at p. 399.) Accordingly, we next consider whether defendant's NGI defense had evidentiary support.

The foundation for an NGI defense is set forth in statute: "In any criminal proceeding, including any juvenile court proceeding, in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." (§ 25, subd. (b).)

Although section 25 is written in the conjunctive—seemingly requiring proof of both (1) incapability of knowing or understanding the nature and quality of the offending act and (2) incapability of distinguishing right from wrong at the time of the act—the California Supreme Court has held the foregoing prongs operate as "distinct and independent bases upon which a verdict of not guilty by reason of insanity might be returned." (*People v. Skinner* (1985) 39 Cal.3d 765, 769.)

Defendant contends there was "affirmative credible evidence to support an insanity defense." He first claims, "[t]he crime was committed in a manner that would raise a question of sanity in the mind of any person." From a lay perspective, his assertion may be true. From a legal perspective, however, the gruesome nature of a murder is not, of itself, indicative of an inability to understand the nature and quality of the act committed nor an inability to appreciate the difference between right and wrong, which are the alternative grounds for an NGI defense.

Defendant relies on *People v. Clemons* (2008) 160 Cal.App.4th 1243 (*Clemons*), but *Clemons* does not support his position. In *Clemons*, the crime at issue was custodial possession of a manufactured weapon in violation of section 4502. The defendant was discovered to be in possession of the weapon (a razor blade from a disposable razor) after he used it to inflict a deep wound in his arm that required 18 stitches. When asked repeatedly what he had used to cut himself, the defendant spat out the razor blade and

15.

"grinned sheepishly at the sheriff's deputies." (*Clemons*, *supra*, 160 Cal.App.4th at pp. 1246, 1253.) Unlike the self-mutilation and apparent lack of self-awareness exhibited by the defendant in *Clemons*, defendant's acts were not directed toward himself and the record reflects he was fully cognizant and aware of his acts and their effect. Defendant testified he repeatedly warned Hite that he would get violent and would "flip out on [Hite]" if Hite continued to belittle him or tried to get sexual with him. In addition, defendant admitted during an interview that he warned Hite he would "kill" him if Hite continued to talk about past rapes and murders, that he was in control of himself when he committed the murder, and that he "knew what [he] was doing." The record reflects defendant was fully aware of his actions.

Notably, California law expressly allows the imposition of a criminal penalty on a person found guilty of committing a torturous act and an additional penalty on a person found guilty of first degree murder where the "murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity"—i.e., a "conscienceless or pitiless crime that is unnecessarily torturous to the victim." (§§ 206, 190.2, subd. (a)(14).) There is no presumption of insanity associated with such crimes. The fact the murder was committed in a gruesome manner is not evidence tending to prove legal insanity.

Defendant also relies on his psychological reports obtained pursuant to section 1368 because they "discussed hallucinations and multiple psychiatric diagnoses." Defendant notes the reports indicated he was not malingering. But the purpose of those reports was to determine defendant's competence to stand trial—not to determine defendant's mental condition at the time of the murder.

The test to determine the mental competence of a defendant to stand trial is different from that used to establish an insanity defense. (*People v. Anderson* (1976) 59 Cal.App.3d 831, 837, fn. 2 ["Insanity under Penal Code sections 1026 and 1027 deals with insanity at the time of the offense and is a different species of mental condition than present insanity."].) "A defendant is mentally incompetent [to stand trial] if, as a result of

a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).) As noted above, the insanity defense requires different proof—i.e., an incapability of "knowing or understanding the nature and quality of [the offending] act [or an incapability] of distinguishing right from wrong *at the time of the commission of the offense*." (§ 25, subd. (b), italics added; *People v. Skinner*, *supra*, 39 Cal.3d at p. 769.)

We have reviewed the psychological reports relied upon by defendant and conclude they do not provide support for an insanity defense. None of the psychologists opined defendant was incapable of knowing or understanding the nature and quality of his acts at the time they occurred or incapable of distinguishing between right and wrong at that time. While it is true that certain of the reports indicate defendant had mental health issues involving schizophrenia (paranoid type) and psychosis, that evidence, in and of itself, does not support an insanity defense—especially where the reports do not make any reference to the effect of those diagnosed conditions on defendant at the time of the murder. (See, e.g., *People v. Blakely* (2014) 230 Cal.App.4th 771, 779–780 [directed verdict of sanity was held proper where the evidence showed the defendant suffered from paranoid schizophrenia but failed to show he did not know the nature and character of his act or was incapable of distinguishing right from wrong].)

Importantly, defendant's own pretrial interview statements taken on the day of the murder and several months thereafter, as well as his testimony at trial, demonstrate defendant was not delusional at the time of the murder. He was not suffering from hallucinations. He was not detached from reality. The fact that his interviews and testimony may contain inconsistencies goes to his credibility but not to his sanity. There is nothing in either his interview statements or his testimony to suggest he was not responding to real, rather than imagined, events at the time he committed the murder. His statements and testimony demonstrate he was acting of his own volition and knew what

17.

he was doing. He even warned Hite he would kill him if he continued to discuss the rape and murder of women. The evidence clearly demonstrates, without contradiction, that defendant understood the nature and quality of his acts at the time he committed the murder.

Likewise, defendant's testimony and pretrial interviews clearly indicate he knew right from wrong. His act of murder was in response to what he viewed as disgraceful and moralless behavior—the claimed rape and murder of women. According to defendant, such heinous acts went against all his values. He even stated to his interviewers that he "knew better" and that his mom raised him to be a good person. The record demonstrates defendant knew the difference between right and wrong and chose to commit murder notwithstanding. There was no evidence to the contrary.

In summary, the record affirmatively demonstrates the insanity defense was baseless. Had the NGI plea been allowed and a second phase of trial on defendant's sanity been conducted, the trial court would have been justified in issuing a directed verdict against defendant on the defense. (See *People v. Blakely*, *supra*, 230 Cal.App.4th at p. 775 ["Because a plea of insanity is an affirmative defense in which the defendant has the burden of proof, the court may, through the grant of a directed verdict, 'remove the issue of sanity from the jury when the defendant has failed to present evidence sufficient to support the special plea.' "]; *People v. Severance* (2006) 138 Cal.App.4th 305, 324 [directed verdict of sanity proper where no substantial evidence of insanity is presented]; *People v. Ceja* (2003) 106 Cal.App.4th 1071, 1089 [same]; *Leach v. Kolb* (7th Cir. 1990) 911 F.2d 1249, 1255–1258 [same; no miscarriage of justice results].)

We conclude there is no reasonable probability defendant would have obtained a better result had the trial court allowed him to enter an NGI plea.

### 2.      Denial of *Marsden* Motion and Ineffective Assistance of Counsel

" 'When a defendant seeks substitution of appointed counsel pursuant to [*Marsden*], "the trial court must permit the defendant to explain the basis of his

contention and to relate specific instances of inadequate performance." ' " (*People v. Streeter* (2012) 54 Cal.4th 205, 230.) " 'A trial court should grant a defendant's *Marsden* motion only when the defendant has made "a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation." ' " (*Ibid.*) " 'A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " (*People v. Taylor* (2010) 48 Cal.4th 574, 599.)

On appeal, we review a trial court's denial of a *Marsden* motion for abuse of discretion. (*People v. Taylor, supra,* 48 Cal.4th at p. 599.) " 'Denial is not an abuse of discretion "unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel." ' " (*People v. Streeter, supra,* 54 Cal.4th at p. 230; accord, *People v. Loya* (2016) 1 Cal.App.5th 932, 944.)

When a trial court erroneously denies a *Marsden* motion, we reverse unless we conclude the error was harmless under *Chapman v. California, supra,* 386 U.S. 18—that is, unless we " 'conclude beyond a reasonable doubt that [the] denial of the effective assistance of counsel did not contribute to the defendant's conviction.' " (*People v. Sanchez* (2011) 53 Cal.4th 80, 92.)

Defendant contends the trial court was required to grant his *Marsden* motion and substitute counsel. In *Henning,* the court concluded that when the trial court learned defense counsel had wrongly refused to allow the defendant to enter an NGI plea, the court should have granted the *Marsden* motion to substitute counsel. (*Henning, supra,* 178 Cal.App.4th at p. 404.) The court also concluded, however, that the error was harmless beyond a reasonable doubt because, despite the vigorous efforts of defense counsel, "no credible evidence could be mustered for an insanity defense." (*Id.* at pp. 404–405.)

19.

We apply *Henning*'s harmless error analysis here, concluding that if the trial court's denial of defendant's *Marsden* motion was error in this case, the error was harmless beyond a reasonable doubt. If the court had substituted counsel and new counsel had allowed defendant to plead NGI, the evidentiary support for an insanity defense would still have been lacking and the defense still would have failed. Having determined defendant's NGI defense to be without merit as a matter of law, we conclude beyond a reasonable doubt that defendant would have fared no better with new counsel. (*Henning*, *supra*, 178 Cal.App.4th at pp. 404–405 [even though defense counsel wrongly refused to allow the defendant to enter an NGI plea, the trial court's failure to substitute counsel was harmless beyond a reasonable doubt because no credible evidence supported an insanity defense].) "Reversal would serve no purpose other than to require the trial court to conduct a sanity trial on a doomed defense." (*Id*. at p. 402.) Thus, the trial court's failure to grant the *Marsden* motion for new counsel was harmless beyond a reasonable doubt.

For the same reasons, defense counsel's refusal to allow defendant to plead NGI was also harmless under any standard. Allowing the NGI plea would not have altered the outcome of the trial. In other words, defendant cannot show that but for counsel's alleged deficient performance there was a reasonable probability the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 217–218; see *Strickland*, at p. 697 [we may adjudicate an ineffective assistance claim solely on the issue of prejudice, without determining the reasonableness of counsel's performance]; *In re Welch* (2015) 61 Cal.4th 489, 516 [same].)

## II.     Prior Prison Term Enhancement

Defendant contends Senate Bill No. 136 applies retroactively to him and requires that his prior prison term enhancement be stricken. The People concede and we agree.

Senate Bill No. 136 (2019−2020 Reg. Sess.) amended section 667.5, subdivision (b) to limit prior prison term enhancements to only prior terms that were served for a sexually violent offense as defined by Welfare and Institutions Code section 6600, subdivision (b).  (§ 667.5, subd. (b), as amended by Stats. 2019, ch. 590, § 1, eff. Jan. 1, 2020.)  Defendant's prior prison term was served for a 2010 motor vehicle theft or related extortion, not for a sexually violent offense, and thus it must be stricken.

The People correctly point out that the proper disposition is to remand to the trial court for resentencing.  In resentencing, "the trial court is entitled to consider the entire sentencing scheme.  Not limited to merely striking illegal portions, the trial court may reconsider all sentencing choices."  (*People v. Hill* (1986) 185 Cal.App.3d 831, 834.)

## DISPOSITION

The one-year prior prison term enhancement imposed pursuant to section 667.5, subdivision (b), is stricken and the matter is remanded to the trial court for resentencing. In all other respects, the judgment is affirmed.

LEVY, Acting P. J.

WE CONCUR:

SMITH, J.

MEEHAN, J.

21.